# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2606

_____

United States of America,             *
                                       *
           Appellee,           *
                                       * Appeal from the United States
    v.                            * District Court for the
                                       * Northern District of Iowa.
Roger Waldner,                  *
                                       *
           Appellant.         *

_____

Submitted: December 9, 2008
Filed: September 4, 2009

_____

Before COLLOTON, BRIGHT, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Roger Waldner pled guilty to two counts of making a false statement in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3). The district court[1] sentenced Waldner to 120 months imprisonment and ordered him to make restitution in the amount of $1,722,717.61. He appeals both his sentence and the restitution order. We affirm.

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

I.

In January 2001, Roger Waldner took control of H&W Motor Express ("H&W"), a trucking company in Dubuque, Iowa. Waldner obtained all of H&W's stock in exchange for his assumption of H&W's corporate debt. Waldner became CEO of H&W, participating in the daily management of the company and assuming control of its financial operations.

Within a few months of assuming control of H&W, Waldner and his associates began transferring approximately $1.8 million worth of assets from H&W to four other corporations with which he had a close relationship–Equity Holdings, Inc. ("EHI"), STRAC, Inc. ("STRAC"), Nationwide Cartage ("Nationwide"), and Solace Transfer ("Solace"). Waldner and his associates formed EHI and STRAC as holding companies for the purpose of acquiring other trucking businesses. Waldner was the president, secretary, treasurer, and sole director of EHI, and, for a time, EHI held Waldner's H&W stock. EHI shared the same address with H&W's headquarters in Dubuque, Iowa. In May 2001, after Waldner had already acquired H&W, H&W's board authorized Waldner to pay EHI $100,000 for "consulting/legal fees" regarding the acquisition of H&W. Waldner and Galley Smith, an officer and board member of H&W, were among those who signed the authorization for the payment to EHI.

Waldner was never listed as owner, officer, or director of STRAC, but he was present during the H&W board meeting at which the board approved the formation of STRAC for the purpose of acquiring non-union trucking companies.[2] The H&W board then issued a resolution, signed by Waldner, authorizing a payment of $100,000 to STRAC to perform a "feasability study" for acquiring Midland Transportation

---

[2]Because H&W was a union company, STRAC was formed to purchase non-union companies so that the two could be kept separate.

("Midland"), a financially troubled trucking company. However, none of this amount was paid to STRAC before it acquired Midland.

Midland subsequently failed, and Waldner used its employees and trucking contracts to form Nationwide on August 10, 2001. Waldner became CEO of Nationwide. Nationwide's address was the same as H&W's address in Dubuque, Iowa, and H&W's employees performed all of Nationwide's billing and payroll services. Nationwide performed hauling services for H&W, the revenue from which was paid to H&W and then transferred to Nationwide. According to one of Nationwide's truck drivers, William Utley, Nationwide earned, at most, $1,500 a week from H&W, which would amount to approximately $36,000 in total payments before H&W filed for bankruptcy in June 2002. However, H&W paid $459,744.56 to Nationwide during this period. H&W's accounts payable clerk, Gregory Wolfe, stated he never saw any invoices that would justify these payments.

Waldner and his wife owned a holding company called One Stop, Inc. ("One Stop"). One Stop also shared the same address as H&W in Dubuque, Iowa. In December 2001, One Stop acquired Solace, which, like Midland, was a financially troubled trucking company. Waldner was the CEO of Solace, and Galley Smith became its president. Solace did not perform any hauling services for H&W until May 2002. These services were estimated to be worth less than $10,000. However, H&W made net payments of $1,262,973.05 to Solace before H&W filed for bankruptcy. As with the payments to Nationwide, H&W's accounts payable clerk stated that he knew of no invoices that would explain these payments. In 2002, Waldner sold Solace for $1.1 million.

H&W filed for bankruptcy in June 2002. Attorney Frank Baron was hired to perform the legal work for H&W's bankruptcy. Baron was paid for his services by Solace. After H&W filed for bankruptcy, Waldner met with Baron, Galley Smith, and a man named Brad Hartke, who had been hired to draft H&W's bankruptcy schedules.

According to Hartke, when he expressed concern over the fact that the payments to Solace and Nationwide had not been included on the bankruptcy schedules, Baron suggested that Hartke and Smith leave the meeting. When Hartke and Smith returned, the schedules were completed without disclosures of the payments to Nationwide or Solace. Although Smith stated that he did not recall discussing anything about the disclosures at this meeting, he did recall being asked to leave with Hartke. Waldner later claimed that he signed blank bankruptcy schedules and that someone else completed them. However, Baron testified that he never gave Waldner blank schedules to sign, and Hartke stated that he witnessed Waldner sign the completed schedules.

Shortly after the filing of the bankruptcy schedules, Waldner appeared at a Section 341 "meeting of creditors" as owner and CEO of H&W to answer questions under oath about the company's bankruptcy.[3] At this meeting, Waldner stated that Solace had no relation to H&W, that he did not know anything about STRAC, that he had no ownership or affiliation with Nationwide, and that he was not aware of any common officers among Solace, Nationwide, and H&W.

In May 2006, Waldner was indicted on 12 counts of knowingly and fraudulently making a false statement under penalty of perjury in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3). On May 18, 2007, immediately after a jury was selected for his trial, Waldner pled guilty to counts 11 and 12 of the indictment. The counts concerned his denials, made at the Section 341 meeting. One denial was of his ownership and affiliation with Nationwide, the other was a denial of any knowledge of common officers among Solace, Nationwide, and H&W. Pursuant to his plea agreement, Waldner stipulated to a number of facts, including stipulations that he signed the completed bankruptcy schedules and that he

_____

[3]11 U.S.C. § 341 states: "Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors."

made fraudulent statements at the Section 341 meeting about the relationship between Solace, Nationwide, and H&W to prevent creditors from reaching the assets transferred from H&W to Solace and Nationwide. In exchange, the remaining ten counts were dismissed.

In preparation for sentencing, the government investigated Waldner's involvement in a number of transactions that suggested the criminal character of his enterprise. In particular, the government questioned Waldner about the purchase of a ring for approximately $5,000, using a Solace check made payable to "McCoy Repair," a non-existent company. The ring was purchased from McCoy Jewelers, a jewelry store in Dubuque, Iowa. Although Waldner claimed that the ring was a gift and he knew nothing of why a Solace check was used to pay for it, the jeweler who made the ring later testified at the sentencing hearing that he had made the ring at Waldner's request. Furthermore, Smith testified that Waldner instructed him to use a check drawn on Solace's funds to pay the fictitious McCoy Repair.

Similarly, the government questioned Waldner about the sale of two truckloads of H&W's equipment after the filing of the bankruptcy petition. The sale was to a Minnesota company named Thompson Motors and was for $17,000. Waldner had instructed Thompson Motors to make two payments in the amount of $8,500 to Sioux Falls Cartage, a defunct company previously owned by Waldner. In an apparent effort to distance himself from this transaction before sentencing, Waldner produced invoices regarding the sale purporting to be from Sioux Falls Cartage and faxed by a man named Greg Hohnecker, who was a supervising mechanic at H&W's garage. However, Hohnecker subsequently testified that he never worked for Sioux Falls Cartage and that he had never seen the documents purporting to be invoices for the sale of H&W equipment to Thompson Motors.[4]

---

[4]Waldner's untruthful statements to investigators regarding the ring and the sale of equipment to Thompson Motors formed the basis for the district court's obstruction-of-justice sentencing enhancement under United States Sentencing Commission, Guidelines Manual, §3C1.1.

During the three-and-a-half-day sentencing hearing, Waldner produced three witnesses on his behalf: Lois Lex, a secretary at H&W; Linda Schueller, a former H&W employee; and Larry Eide, a lawyer who served as trustee for H&W's bankruptcy estate. Lex claimed to have loaned Waldner $700,000, even though she never earned more than $30,000 a year, owed $60,000 on her mortgage, and owned no stock or other investments. Lex also testified that Waldner's subordinates, especially Galley Smith, were responsible for the suspicious transactions and that, in her opinion, Waldner did not know anything about STRAC. Schueller, who has no training in accounting, attested to the legitimacy of H&W's transactions and minimized Waldner's role in the company's financial operations. Eide had originally accused Waldner of secreting away $1.5 million of H&W's assets, and brought an action against Waldner, Waldner's wife, and One Stop to recover the funds. However, Eide then proposed a settlement agreement in which Lex would pay H&W's bankruptcy estate $5,000. In exchange, the estate would hire the law firm that represented Waldner to recover funds for the bankruptcy estate. After their recovery, 80 percent of the funds would be paid to Lex and the law firm. Eide testified at Waldner's sentencing hearing that an unspecified amount of money had come back into H&W's accounts. The district court did not find Lex, Schueller, or Eide to be credible.

At the conclusion of the sentencing hearing, the district court made a number of sentencing determinations. First, the court determined Waldner's base offense level to be six under United States Sentencing Commission, Guidelines Manual, §2B1.1(a). Then, the court applied a number of enhancements: (1) a two-level increase for committing fraud during a bankruptcy proceeding under USSG §2B1.1(b)(8)(B); (2) a 16-level increase for intending to cause a loss in excess of $1 million under USSG §2B1.1(b)(1)(I); (3) a two-level increase for using sophisticated means under USSG §2B1.1(b)(9)(C); (4) a two-level increase for abusing a position of private trust under USSG §3B1.3; and (5) a two-level increase for obstruction of justice under USSG §3C1.1. The court then denied Waldner's request for a two-level decrease for

acceptance of responsibility under USSG §3E1.1. This resulted in an offense level of 30. With a Criminal History Category of I, Waldner's advisory Sentencing Guidelines range was 97 to 121 months, which was limited to 97 to 120 months by the five-year statutory maximum for each of the two counts of violating 18 U.S.C. § 152(3). At this point, the court then made four additional findings that it characterized as "upward departures": (1) causing extreme psychological injury under USSG §5K2.3; (2) causing property loss or damage not taken into account by the Sentencing Guidelines under USSG §5K2.5; (3) committing the offense in order to facilitate or conceal the commission of another offense under USSG §5K2.9; and (4) dismissed and uncharged conduct under USSG §5K2.21. Based on these findings, the court "departed upward" and found that Waldner had an advisory Guidelines range of 120 months. After considering the factors under 18 U.S.C. § 3553(a), the court sentenced Waldner to 120 months imprisonment. In addition to the sentence, the court awarded restitution in the amount of $1,722,717.61 to H&W's bankruptcy estate. This amount reflects the approximately $1.2 million paid to Solace and the $460,000 paid to Nationwide.

## II.

> The district court should begin with a correct calculation of the advisory Sentencing Guidelines range. Then, after giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party. The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." The sentence chosen should be adequately explained so as "to allow for meaningful appellate review and to promote the perception of fair sentencing."

United States v. Braggs, 511 F.3d 808, 812 (8th Cir. 2008) (quoting Gall v. United States, 128 S. Ct. 586, 597 (2007)). We review a sentence for abuse of discretion,

> first ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.

Gall, 128 S. Ct. at 597. The district court's sentencing enhancements must be supported by a preponderance of the evidence. United States v. Boyce, 564 F.3d 911, 915 (8th Cir. 2009).

Waldner challenges his sentence on the grounds that the district court committed significant procedural error by enhancing his Guidelines range based on unsupported factual findings and abused its discretion in determining a substantively unreasonable sentence. The parties agree that Waldner's base offense level for two violations of 18 U.S.C. § 152(3) is six under USSG §2B1.1(a) and that he is subject to a two-level increase for fraud committed during a bankruptcy proceeding under USSG §2B1.1(b)(8)(B).

First, Waldner challenges the 16-level increase under USSG §2B1.1(b)(1)(I) for causing a loss of more than $1,000,000 to his creditors. As a general rule, "loss is the greater of actual loss or intended loss." USSG. § 2B1.1, comment. (n.3(A)). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," while "'[i]ntended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. at comment. (n.3(A)(i-ii)). Because the loss caused by fraud is often difficult to determine precisely, "a district court is charged

only with making a reasonable estimate of the loss." United States v. Parish, 565 F.3d 528, 534 (8th Cir. 2009) (quotation omitted).

Waldner points to the testimony of Lex, Schueller, and Eide in an attempt to show that H&W had made legitimate payments to EHI, STRAC, Solace, and Nationwide. Waldner also argues that the suspicious transfers were not permanent, but were intended to be temporary "paper transactions" by Galley Smith in an effort to make the other companies appear to be in better financial health than they were. However, the district court's finding that the intended loss exceeded $1 million is supported by a preponderance of the evidence. The district court's finding that the testimony of Lex, Schueller, and Eide was not credible is afforded great deference and is supported by the record. See United States v. Martinez, 557 F.3d 597, 600 (8th Cir. 2009). The record shows that, while under Waldner's control and during the year preceding its bankruptcy, H&W made payments to Solace, Nationwide, STRAC, and EHI in the amount of approximately $1.8 million. In his plea agreement, Waldner stipulated to the fact that "[d]isassociating H&W from Solace and Nationwide may have prevented creditors from seeking to satisfy H&W debts from the assets of Solace and Nationwide, and therefore [Waldner] intended to defraud creditors by making the false statement." Plea Agreement ¶ 28(D), United States v. Waldner, No. 2:06-cr-01019-LRR (N.D. Iowa July, 2008). The district court found that, at Waldner's direction, H&W transferred approximately $1.2 million to Solace and approximately $460,000 to Nationwide. Thus, even if the approximately $200,000 transferred to STRAC and EHI were excluded from the loss calculation, the facts as stipulated in the plea agreement show that Waldner committed fraud during the bankruptcy proceedings with the intention of causing a loss of greater than $1 million to his creditors. Therefore, the district court did not err in applying a 16-level enhancement for intending to cause a loss of more than $1 million.

Second, Waldner challenges his two-level increase for using "sophisticated means" under USSG §2B1.1(b)(9)(C). "Conduct such as hiding assets or transactions,

or both, through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means." Id. at comment. n.(8(B)). The record amply supports a finding that Waldner used EHI, STRAC, Nationwide, and Solace as corporate shells to hide assets from H&W's creditors. This is precisely the type of conduct to which the enhancement for using sophisticated means should apply. Therefore, the district court did not err in applying the two-level enhancement for using sophisticated means.

Third, Waldner challenges his two-level enhancement for abuse of a position of private trust under USSG §3B1.3. The commentary to section 3B1.3 defines a position of private trust as a position that is

> characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

USSG §3B1.3, comment. (n.1). Once the sentencing court has determined that a person occupies a position of private trust, "the position of . . . trust must have contributed in some significant way to facilitating the commission or concealment of the offense . . ." before the enhancement may apply. Id. Furthermore, "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." USSG §3B1.3.

Waldner argues that, although he was CEO and owner of H&W, he occupied no position of private trust either with respect to the company or its creditors. As the district court found, Waldner's position as CEO and sole owner endowed him with significant discretion and control over H&W's operations. However, the district court

-10-

did not expressly discuss whose trust Waldner abused.[5] Nonetheless, the record demonstrates that Waldner abused the trust of H&W's creditors when he committed fraud at the Section 341 creditors meeting.

Although "an arms-length commercial relationship will ordinarily not suffice for the enhancement to apply, . . . [w]e have upheld the application of the enhancement in situations involving arms-length commercial relationships." United States v. Septon, 557 F.3d 934, 937 (8th Cir. 2009) (citing United States v. Fazio, 487 F.3d 646, 659 (8th Cir.), cert. denied, 128 S. Ct. 523 (2007), United States v. Erhart, 415 F.3d 965, 972 (8th Cir. 2005)). Moreover, this is not a typical arms-length relationship between creditor and debtor, because "[t]his examination under oath [at a Section 341 meeting] enables creditors and the trustee to determine if assets have improperly been disposed [of] or concealed." In re Parmetex, Inc., 199 F.3d 1029, 1036 (9th Cir. 1999) (McKeown, J., dissenting) (quotation omitted). As Section 341 meetings are not adversarial proceedings, reliance on the debtor's oath of truthfulness is necessary for the meeting to function properly. Thus, Waldner's position enabled him to perpetrate the scheme whereby he drove H&W into bankruptcy by siphoning off its assets. His position also helped him conceal this scheme by making fraudulent statements during the Section 341 creditors meeting.

---

[5]The district court cited to cases holding that CEOs and other corporate officers occupy positions of trust. See United States v. Morris, 18 F.3d 562, 568 (8th Cir. 1994) (abuse-of-trust enhancement applied to CEO and board chairman of bank); United States v. Buck, 324 F.3d 786, 795 (5th Cir. 2003) (president and CEO of a nonprofit corporation occupied a position of private trust). However, "the issue of whether an abuse-of-trust enhancement applies is fact intensive because it turns on the precise relationship between the defendant and [his] victims and therefore cannot be decided on the basis of generalities . . . ." United States v. Septon, 557 F.3d 934, 937 (8th Cir. 2009) (quotation omitted). Although Waldner was CEO of H&W, he was also its sole shareholder. This arguably undermines the importance of the fact that he was H&W's CEO because there were no other shareholders to whom he owed fiduciary duties. We need not decide this issue, however, because it is not necessary to affirming the enhancement in this case.

Furthermore, this enhancement is not duplicative of Waldner's base offense level or specific offense characteristic. "[S]entencing courts err when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." United States v. Smith, 516 F.3d 473, 476 (6th Cir. 2008) (quotation omitted) (affirming abuse-of-trust enhancement for convictions of wire fraud and making a false statement on a loan application). "But in this instance the [abuse-of-trust] enhancement[] [and the underlying offenses] penalize distinct aspects of [Waldner's] conduct and distinct harms." Id. (quotation omitted). The abuse-of-trust enhancement accounts for Waldner's efforts to use his position to defraud creditors who were entitled to rely on his representations at the creditors meeting. The prohibition on fraud during a bankruptcy proceeding is one instance of the more general prohibition on perjury that seeks to protect the integrity and dignity of government proceedings. Thus, the district court did not abuse its discretion in enhancing Waldner's sentence for abusing a position of private trust. Cf. Fazio, 487 F.3d at 659 (affirming abuse-of-trust enhancement for real estate agent who committed wire and mail fraud by submitting fraudulent claims to a mortgage company); United States v. Goldman, 447 F.3d 1094, 1096 (8th Cir. 2006) (holding that attorney who lied during a bankruptcy proceeding abused a position of public trust); Erhart, 415 F.3d at 972-73 (affirming abuse-of-trust enhancement for chiropractor who submitted false insurance claims).

Fourth, Waldner challenges his two-level increase for obstruction of justice under USSG §3C1.1. The commentary to USSG §3C1.1 states, in pertinent part, that the obstruction-of-justice enhancement applies to the "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding," id. at comment. (n.4(c)), as well as "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense," id. at comment. (n.4(g)). The district court properly applied this enhancement based on sufficiently supported factual findings. First, the district court properly found that, in preparation for the sentencing hearing, Waldner produced two forged facsimile

documents purporting to be invoices for $8,500 from the defunct Sioux Falls Cartage relating to the sales of two truck loads of H&W equipment to another business, Thompson Motors. Although the facsimiles purport to be from Greg Hohnecker, a former H&W employee, Hohnecker testified at the sentencing hearing that he had never seen the documents bearing his name. The sale of this equipment occurred after H&W filed for bankruptcy. Based on this fact and Hohnecker's testimony, it was a permissible inference that the two invoices were designed to evade the IRS's reporting requirements and, therefore, that the sale of this equipment was part of Waldner's scheme to hide H&W's assets from its creditors. This scheme was conduct relevant to the two counts of fraud during a bankruptcy proceeding to which Waldner pled guilty. Waldner also denied, during the investigation, that he purchased a ring from McCoy Jewelers with $5,000 of Solace's funds. However, this was undermined by ample evidence showing that he orchestrated the transaction. The record clearly supports the district court's two-level enhancement for obstruction of justice under USSG §3C1.1. See id. at comment. (n.4(c)).

Similarly, "[f]lowing from our determination regarding the adjustment for obstruction of justice is our support of the district court's denial of any reduction for acceptance of responsibility." United States v. King, 559 F.3d 810, 815 (8th Cir. 2009), petition for cert. filed, (U.S. Jun. 12, 2009) (No. 08-10961). Although "[t]here may . . . be extraordinary cases in which adjustments" both upwards for obstruction of justice and downwards for acceptance of responsibility may apply, "[c]onduct resulting in an enhancement [for obstruction of justice] ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." USSG §3E1.1, comment. (n.4). Although Waldner pled guilty, "[a] defendant who enters a guilty plea is not entitled to an adjustment under [USSG §3E1.1] as a matter of right." Id. at comment. (n.3). Even after his guilty plea, Waldner continued to deny any intention to secrete H&W's funds away from the reach of its creditors, a fact which he stipulated to be true in his plea agreement. "[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in

-13-

a manner inconsistent with acceptance of responsibility." Id. at comment. (n.1(a)). This is not one of those extraordinary circumstances in which an offense level increase for obstruction  of justice applies as well as a decrease for acceptance of responsibility.

Thus, the district court properly calculated Waldner's offense level at 30. With a Criminal History Category I, his advisory Guidelines range was 97 to 121 months imprisonment.  With the statutory maximum of 120 months, see 18 U.S.C. 152, this became an advisory range of 97 to 120 months imprisonment.

The district court then made a number of what it called "upward departures" to the advisory sentencing range of 97 to 120 months imprisonment: (1) causing extreme psychological injury under USSG §5K2.3; (2) causing property loss or damage not taken into account within the Sentencing Guidelines under USSG §5K2.5; (3) committing the offense in order to facilitate or conceal the commission of another offense under USSG §5K2.9; and (4) dismissed and uncharged conduct under USSG §5K2.21.  Based on these "departures," the district court recalculated Waldner's advisory Guidelines range to be 120 months.

The government concedes that the first of these "upward departures," extreme psychological injury under USSG §5K2.3, was found in error.  Notwithstanding this concession, district courts are to use "upward departures" to justify implementing a specific sentence *above* the authorized Guidelines range, not to narrow a properly-calculated Guidelines range.  See USSG §§5K2.3; 5K2.5; 5K2.9; and 5K2.21. Accordingly, the district court committed significant procedural error when it purported to use these "departures" to calculate a new advisory Guidelines range of 120 months. See USSG §5K2.0(a)(1)(A) ("The sentencing court may depart from the applicable guideline range if . . . there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . . ."); Irizarry v. United States, 128 S. Ct. 2198, 2202

(2008) ("'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines.").

While "[a] failure to properly calculate the advisory Guidelines range is a significant procedural error, [only] a non-harmless error in calculating the [G]uidelines range requires a remand for resentencing." United States v. Tomac, 567 F.3d 383, 385-86 (8th Cir. 2009). After considering the section 3553(a) factors, the district court determined that 120 months was the appropriate sentence. Furthermore, the district court stated that "[i]n the event that the court was mistaken about the propriety of all its upward departures and the Defendant's advisory Sentencing Guidelines range were 97 to 120 months . . . instead of 120 months of imprisonment, the court would nonetheless have imposed a sentence of 120 months imprisonment." Sentencing Mem. 50-1, Waldner, No. 2:06-cr-01019-LRR; see United States v. Johnson, 572 F.3d 449, 455 (8th Cir. 2009) ("Even assuming that the district court procedurally erred . . . any such error would be harmless [because] . . . [t]he district court explained that had it not granted the upward departure . . . it still would have imposed [the] sentence . . . based on the § 3553(a) factors."). We presume a sentence within the properly calculated Guidelines range to be reasonable. United States v. James, 564 F.3d 960, 964 (8th Cir. 2009). In this case, the range was 97 to 120 months. Thus, as the sentence was within the properly calculated advisory Guidelines range, we affirm as substantively reasonable the district court's sentence of 120 months imprisonment.

### III.

Waldner also appeals the district court's award of restitution in the amount of $1,722,717.61 to H&W's bankruptcy estate.[6] The Mandatory Victims Restitution Act ("MVRA") mandates, in pertinent part, that a trial court award restitution when

---

[6]This amount reflects the amounts transferred to Solace, $1,262,973.05, and Nationwide, $459,744.56.

sentencing a defendant convicted of "an offense against property under [Title 18], . . . including any offense committed by fraud or deceit[.]"[7]  18 U.S.C. § 3663A(c)(1)(A)(ii).

First, Waldner argues that these transfers were legitimate transactions and, therefore, cannot be counted as losses incurred by the H&W's creditors.  This argument fails for the same reason Waldner's challenge to the 16-level enhancement for causing a loss in excess of $1 million failed.  His claim that these transactions were legitimate is refuted by the fact that he stipulated in his plea agreement that he intended to defraud H&W's creditors when he attempted to hide the amounts transferred to Solace and Nationwide.

Second, Waldner argues that the specific conduct for which he was convicted did not cause the loss.  See Hughey v. United States, 495 U.S. 411, 413 (1990) (holding that under the Victim and Witness Protection Act, the predecessor of the MVRA, a trial court is authorized to make "an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction"). "However, we take a broad view of what conduct and related loss amounts can be included in calculating loss." United States v. DeRosier, 501 F.3d 888, 896 (8th Cir. 2007).  Although the two acts of bankruptcy fraud were not the sole causes of the loss, as other acts were required by Waldner and associates to shield H&W's assets from its creditors, they were undertaken with the intention of, and did in fact contribute to, the furtherance of the scheme.  Thus, the district court properly awarded restitution.

---

[7]The MVRA applies because Waldner pled guilty to two counts of committing fraud in violation of 18 U.S.C. § 152(3).

IV.

Accordingly, we affirm the district court's sentence of 120 months imprisonment and its award of restitution in the amount of $1,722,717.61.

BRIGHT, Circuit Judge, concurring separately.

The district court imposed the maximum possible penalty under the law (ten years). I would note that Waldner is a first-time offender, a good wage earner in his earlier positions, and apparently a good father and husband.

The sentence does appear heavy but it was within the discretion of the district court. Thus, I concur.

_____