# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3161

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Marvin R. Mitchell, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 13, 2010
Filed: June 28, 2010

_____

Before WOLLMAN, MURPHY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Marvin Mitchell was convicted of bankruptcy fraud in violation of 18 U.S.C. § 152. The district court[1] sentenced him to eighteen months' imprisonment. He appeals, arguing that the district court miscalculated the intended financial loss for the purpose of sentencing. We affirm.

---

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

I.

Mitchell began farming in Louisiana and Iowa in 1994. In 1998, a drought ruined Mitchell's crop and a windstorm destroyed his grain storage building just before harvest. His finances deteriorated rapidly and he was sued by Stine Seed for unpaid seed in 2000. In that same year, Mitchell began transferring farmland and equipment for no consideration to Third Rock, Inc., an Iowa corporation that he had formed with his wife, Marlene Mitchell. In 2001, Mitchell acquired another Iowa corporation, Lost Prairie, L.C., and began moving crop proceeds through it. Also in 2001, Mitchell opened an account under the name "REMA Trust Clearing" at a bank in West Des Moines, Iowa. In August 2001, Stine Seed won a judgment against Mitchell for $322,900.96, and he filed for bankruptcy in 2002. In his bankruptcy filing, Mitchell did not mention his interests in Third Rock, Lost Prairie, or the REMA account. Mitchell was indicted for bankruptcy fraud and he pleaded guilty to one count of concealing assets, in violation of 18 U.S.C. § 152(1).

At sentencing the only issue before the court was the amount of loss. Under United States Sentencing Guidelines Manual (U.S.S.G) § 2B1.1(a)(2), the base offense level was six. Mitchell argued that the intended loss was approximately $36,000, reflecting the balance of the concealed REMA account on the day of the bankruptcy filing and a property in Arkansas worth $7,000. Mitchell claimed that all of his other assets were encumbered by liens and worth nothing. A loss of more than $30,000 but less than $70,000 would have resulted in a six-level enhancement under U.S.S.G. § 2B1.1(b)(1)(D), producing a guideline range of ten to sixteen months' imprisonment.

The presentence investigation report (PSR) estimated the loss differently. It estimated a loss of $469,850 in equipment and $578,000 in land transferred to Third Rock for no consideration. The PSR estimated a loss of $180,198 from the REMA account, reflecting the cash balance at the time of filing and recent payments to

Maurice Mitchell, Sr., Marvin's father. The PSR also estimated losses totaling $50,992 from a crop insurance payment within a year of the bankruptcy filing, a payment for land sold in Iowa, and the value of the land in Arkansas.

The PSR noted that the government, pursuant to Mitchell's plea agreement, had agreed that the intended loss was not less than $30,000, but not more than $1 million. Calculating the intended loss as more than $400,000 but less than $1 million, the PSR recommended a fourteen-level increase in the offense level under U.S.S.G. § 2B1.1(b)(1)(H). With a two-level enhancement for misrepresentation in a bankruptcy proceeding offset by a two-level reduction for acceptance of responsibility, the total offense level was twenty. Mitchell's criminal history category was I. According to the PSR, the guideline range was thirty-three to forty-one months' imprisonment.

The district court held a lengthy sentencing hearing to resolve the issue. Charles Smith, the Chapter 7 bankruptcy trustee, testified for the government. Smith explained that the bankruptcy was exceedingly complicated because Mitchell had attempted to conceal his assets. Mitchell refused to cooperate with the trustee and falsely claimed that he did not possess any business records. Ultimately, the FBI executed a search warrant of Mitchell's house and office. The search produced records of the various ways that Mitchell had sought to hide assets, i.e. the Third Rock and Lost Prairie shell companies and the REMA account. Using the records, Smith was able to locate the assets that Mitchell had concealed in his bankruptcy filing. Smith estimated that Mitchell's farmland was worth $950,000, but subject to an unavoidable lien of approximately $450,000. Smith testified that this left "about $500,000 worth of equity in the land."

The district court stated the basis upon which it estimated the intended loss:

> The Court believes the best estimate of Defendant's assessment comes from the actual market value of the property because Defendant's numerous overlapping financial transactions involving all the concealed assets indicate he was acutely aware of their actual market value.
>
> Further, the Court will discount any lien on the assets, thereby focusing on the Defendant's equity in each item, because Defendant was aware of the liens and mortgages and did not attempt to preclude the secured creditors from levying on their liens or mortgages, which indicates that he was only trying to defraud the general creditors of his equity interest. He was not attempting to defraud others out of the entire value of the property.

Immediately before the court announced its decision, Mitchell's counsel produced documents that purportedly showed that the judgments of Maurice Mitchell and Stine Steed had attached to the farmland. Mitchell's counsel claimed that these judgments left the farmland bereft of any equity. Mitchell, however, presented no testimony corroborating this theory and it was apparently disregarded by the district court. The court then relied upon the trustee's assessment that $500,000 equity remained in the farmland because "as an experienced trustee, he would be in the best position to determine what liens are avoidable."

The court thus found that Mitchell intended to conceal $500,000. Because this amount put Mitchell between $400,000 and $1 million, the court saw no need to delve into the value of the other concealed assets. Agreeing with the recommendation of the PSR, the court applied a fourteen-level enhancement. The court, however, varied downward based upon the 18 U.S.C. § 3553(a) factors and sentenced Mitchell as set forth above.

## II.

When considering a challenge to a district court's loss calculation, we review the district court's interpretation of the sentencing guidelines *de novo* and the underlying factual findings for clear error. United States v. Holthaus, 486 F.3d 451, 454 (8th Cir. 2007).

### A.

Under the guidelines, the general rule is that "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). As both parties agree, Mitchell's case turned on the amount of intended loss because the bankruptcy court refused to discharge Mitchell's debts and no actual loss occurred. See Holthaus, 486 F.3d at 454. Thus, the key question was the amount of loss that Mitchell intended to cause his creditors, which the government was required to prove by a preponderance of the evidence. Id. at 455; United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005). Because losses from bankruptcy fraud are difficult to determine with precision, the district court was required to reasonably estimate the loss. United States v. Waldner, 580 F.3d 699, 705 (8th Cir. 2009); see U.S.S.G. § 2B1.1, cmt. n.3(C).

Mitchell contests the district court's calculation. He argues that his liabilities totaled more than $1.1 million at the time of his bankruptcy filing, and thus he claims that he "had no equity in the assets that he attempted to conceal." He asserts that a judgment of $560,160.28 to Maurice Mitchell, Sr., and the judgment to Stine Seed had attached to the farmland and thus could not have been avoided in bankruptcy. Because the total of these judgments exceeds the estimated value of the farmland, Mitchell believes that the amount of intended loss should have been zero.

We disagree. In a complicated proceeding such as this, the district court must reasonably approximate the value of the assets that the defendant fraudulently sought

to preserve. <u>Waldner</u>, 580 F.3d at 705. This task was doubly challenging because the fraud was predicated upon concealment of assets and obfuscation of value. The trustee's testimony was that Mitchell's farmland was worth $950,000 at the time of the bankruptcy. The farmland was subject to a lien from Metropolitan Life for approximately $450,000. Mitchell had a number of other liabilities, but the trustee testified that the lien from Metropolitan Life was the only liability that could not be avoided. Accordingly, the trustee testified that there would have been approximately $500,000 in equity in the farmland available to the general creditors.

Mitchell's last minute introduction of documents purporting to show additional encumbrances did not outweigh the trustee's testimony. Moreover, Mitchell's argument that he had no equity left in the concealed assets was simply not a reasonable interpretation of the facts. Mitchell had engaged in an elaborate attempt to commit bankruptcy fraud, which was, in his own words, designed to protect "everything" that he had worked for, including the REMA account, and the land and equipment held by Third Rock. He was not merely trying to discharge his liabilities and start anew. He intended to protect substantial assets from his creditors by concealing significant amounts of equity. Otherwise, his actions appear entirely irrational. Given these circumstances, it was reasonable for the district court to rely upon the trustee's assessment and evaluate the intended loss at $500,000. The district court's factual findings were not clearly erroneous, and thus the sentence is affirmed.

_____