United States Court of Appeals

For the Eighth Circuit

_____

No. 16-4174

_____

United States of America

*Plaintiff - Appellee*

v.

Theodore E. Suhl

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 21, 2017
Filed: March 22, 2018

_____

Before COLLOTON, BENTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

A jury convicted Theodore Suhl of bribing an Arkansas state official. He appeals, arguing that the district court[1] improperly defined the crime of bribery when analyzing his indictment and instructing the jury, committed evidentiary errors, and

_____

[1]The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

unreasonably calculated the loss due to his bribery scheme. We address each argument in turn.

## I. Facts

Three individuals are key to this case. The first is Suhl, a successful Arkansas businessman. Among the businesses that Suhl owned or ran were two for-profit companies that provided mental health treatment to juvenile Medicaid recipients. Between 2007 and 2011, these two companies received over $10 million per year in Medicaid reimbursement. The second is Phillip Carter, an Arkansas probation officer. Carter and Suhl knew each other because Carter frequently referred juveniles for treatment at Suhl's companies. The third is Steven Jones, a former state legislator and the second-in-command at the Arkansas Department of Health and Human Services (ADHS). ADHS is Arkansas's largest agency; its responsibilities include administration of Arkansas's federally-funded Medicaid program and regulation of juvenile mental health care providers.

Suhl knew Jones from Jones's days as a state legislator, and he sought to capitalize on that acquaintance. At some point, Suhl asked Carter to arrange a meeting with Jones; Carter replied that the meeting would only happen if Suhl paid Jones a $2,000 "fee." Suhl agreed, and wrote a $2,000 check to the church Carter attended, telling Carter "y'all know what to do with it, do what you want with it." Soon afterward, Suhl met with Jones over dinner. After that meeting, Carter's church (through its pastor, John Bennett) wrote Jones a check for $2,000.

This pattern repeated itself for four years. Suhl would call Carter, Carter would call Jones, Suhl would pay Carter's church, Suhl and Jones would meet, and Carter's church would pay Jones. At their meetings, and by phone through Carter, Suhl would ask Jones to assist his businesses. Some of his requests were broad: "see what he can do to help us." Others were more specific. In an effort to increase his companies'

Medicaid reimbursement rates, for example, Suhl asked Jones "to see if he can get the Medicaid portion of [ADHS] . . . up under his jurisdiction." Suhl also sought more clients by asking Jones to increase the geographical radius from which one of his companies could receive referrals. And Suhl asked Jones to convince the governor to reappoint him to a state board that licenses and inspects juvenile residential treatment facilities.

Jones never specifically agreed to do any of the things Suhl asked. He told Suhl he would "look into" his requests, and sometimes reported that he had involved himself in a meeting so he could gain information for Suhl. But there is no evidence that Jones ever did anything more than inquire into Suhl's requests.

Suhl's last meeting with Jones was over dinner at a steakhouse in Memphis, Tennessee. Carter was also there. That meeting was comprehensively documented by the FBI, which was investigating Suhl and his companies. FBI agents were listening when Suhl called Carter to complain that a rival company was receiving all the ADHS juvenile mental health referrals in northeastern Arkansas. Suhl told Carter that he wanted Jones to put a stop to this, and to direct the referrals to one of his companies instead. Agents also heard Jones accept Carter's invitation to meet with Suhl, but only if Suhl had "enough time to make sure he's got everything together for us." At the steakhouse, video surveillance recorded Suhl passing Carter a check intended for Jones.

FBI agents approached Carter soon after this final meeting. Confronted with the wiretap and video surveillance evidence, Carter agreed to help the FBI investigate Suhl and Jones. Agents watched when Carter—now working with the FBI— took Jones the check Suhl had given him at the dinner. Jones accepted the money, and the FBI confronted him. Jones also agreed to help the FBI.

A grand jury indicted Suhl on one count of conspiracy in violation of 18 U.S.C. § 371; three counts of honest-services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; one count of federal-funds bribery in violation of 18 U.S.C § 666(a)(2); and one count of interstate travel in aid of bribery in violation of 18 U.S.C. § 1952(a)(3). After trial, a jury convicted Suhl on the federal-funds bribery count, the count of interstate travel in furtherance of bribery, and two of the honest-services wire fraud counts. He was acquitted of all other counts. The district court imposed an 84-month sentence. Suhl timely appealed.

## II.    Discussion

On appeal, Suhl alleges three sets of errors. First he argues that the district court misinterpreted the federal bribery statutes, leading to errors in analysis of the indictment and instruction of the jury. Next, Suhl contends that the district court violated his right under the Confrontation Clause by limiting cross-examination of two witnesses, and abused its discretion by excluding evidence of his charitable giving. Finally, Suhl claims that the district court failed to accurately calculate the loss due to his bribery for purposes of sentencing.

### A.    Application of the Bribery Statutes

Suhl objects to the way the indictment and the jury instructions applied the federal bribery statutes to his conduct. Because Suhl's arguments involve the interplay of several anti-bribery statutes, a bit of background is useful.

### 1.    Background

Federal statutes criminalize both the making and the taking of bribes, with separate subsections laying out different elements for defendants who pay bribes (the

payor) and defendants who take bribes (the payee). See, e.g., 18 U.S.C. § 201(b)(1), (2); 18 U.S.C. § 666(a)(1), (2). Suhl paid money to Jones, so he is a payor defendant.

Suhl was charged under two federal bribery statutes. The first is 18 U.S.C. § 666, which criminalizes what we will call "federal-funds bribery." Suhl was charged under the provision of the statute that makes it a crime to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent of . . . a State . . . or any agency thereof . . . in connection with any business transaction . . . of such [government] agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). A jurisdictional provision of the statute limits its application to agencies that receive "benefits in excess of $10,000 under a Federal program." Id. § 666(b). The parties do not contest that ADHS is such an agency.

The second statute is 18 U.S.C. §§ 1343 and 1346, which together criminalize "a scheme or artifice to deprive another of the intangible right of honest services." In Skilling v. United States, 561 U.S. 358, 408–09 (2010), the Supreme Court limited this statute's application to bribery and kickback schemes. Since Suhl was charged under a bribery theory, we will call this "honest-services bribery."

Following Skilling, it was unclear where courts should look to find the elements of honest-services bribery. Some have sought guidance from the general federal bribery statute, 18 U.S.C. § 201.[2] See United States v. Terry, 707 F.3d 607, 612–13 (6th Cir. 2013); United States v. Ring, 706 F.3d 460, 465–67 (D.C. Cir. 2013). In this case, the parties agree that § 201 provides the elements of honest-services bribery. The relevant portion of § 201 makes it a crime to "directly or

---

[2]Section 201 generally applies only to bribery of federal officials. 18 U.S.C. § 201(a)(1). Honest-services bribery extends § 201's prohibitions to state and local officials. Skilling, 561 U.S. at 413 n.45.

indirectly, corruptly give[], offer[], or promise[] anything of value to any public official . . . , or offer[] or promise[] any public official . . . to give anything of value to any other person or entity, with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A).

Two Supreme Court cases relevant to our analysis have examined portions of § 201. In United States v. Sun-Diamond Growers of California, the Court explained that the words "intent to influence" require "a *quid pro quo*—a specific intent to give . . . something of value *in exchange* for an official act." 526 U.S. 398, 404–05 (1999). And recently in McDonnell v. United States, the Court narrowly defined "official act" to mean

> a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.

136 S. Ct. 2355, 2371–72 (2016) (quoting 18 U.S.C. § 201(a)(3)). Merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit [the] definition of 'official act.'" Id. at 2372.

## 2. Indictment

Suhl argues that the indictment—which was filed pre-McDonnell—failed to state an offense, and that the government, rather than correcting its mistake by filing a superceding indictment, simply constructively amended the indictment at trial. We review the district court's refusal to dismiss the indictment de novo, and we will reverse only if the indictment is "so defective that it cannot be said, by any reasonable

construction, to charge the offense for which the defendant was convicted." United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008).

Suhl's argument appears to have several parts: (1) McDonnell applies to both honest-services and federal-funds bribery; (2) McDonnell requires an agreement between bribe payor and bribe payee to exchange something of value for an official act and, because the indictment did not allege an agreement between Suhl and Jones, it did not state a crime; and (3) when the government became aware of this problem, it constructively amended the indictment. We address each part of the argument in turn.

Suhl asks us to apply McDonnell to both honest-services and federal-funds bribery. McDonnell interpreted the term "official act" in § 201, and the parties agree that § 201 also defines the elements of honest-services bribery. Section 666, however, does not include the term "official act."

Nevertheless, even if we assume that McDonnell's definition of "official act" applies to both honest-services and federal-funds bribery, we are unconvinced that McDonnell requires the sort of agreement that Suhl describes. Suhl cites to the language in McDonnell wherein the Court explained that "[t]o qualify as an 'official act,' the public official must make a decision or take an action on [a] 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." 136 S. Ct. at 2372. But that passage applied the definition of "official act" to the portion of § 201 dealing with *payee* defendants.[3] See 18 U.S.C. § 201(b)(2)(A) (requiring "performance of any official act"). The portion of § 201 relevant to payors like Suhl requires only an "intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A). The relevant

_____

[3]The defendants in McDonnell were a former Virginia governor and his wife, whom the government charged with *taking* bribes. See McDonnell, 136 S. Ct. at 2361–66.

portion of the federal-funds bribery statute likewise requires payment with "intent to influence" a state actor "in connection with any business . . . of . . . [a state] agency." 18 U.S.C. § 666(a)(2). Neither of these statutes, nor McDonnell, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act. A payor defendant completes the crimes of honest-services and federal-funds bribery as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement.[4]

The indictment, therefore, adequately stated the offenses of honest-services and federal-funds bribery. Assuming official acts are required under both statutes, the indictment identified the official acts that Suhl sought to influence. It included transcripts of Suhl's phone calls with Carter, which detailed how Suhl asked Jones to increase Medicaid reimbursement to his companies, draw a larger area from which his companies could receive referrals, ensure his reappointment to a state review board, and end a referral policy that benefitted one of his competitors. The indictment incorporated these facts into both the honest-services and federal-funds bribery counts. All of these acts involved a request for the "formal exercise of governmental power," as required by McDonnell, 136 S. Ct. at 2371–72. That placed Suhl on fair notice that the government was alleging that he had paid money with an intent to influence official acts, see Sewell, 513 F.3d at 821, and we do not understand Suhl to argue that the requests made in the phone calls detailed above did not qualify as formal exercises of governmental power under McDonnell.

Given that the indictment stated an offense, Suhl's assertion that the government constructively amended the indictment also fails. Constructive amendments occur "when the essential elements of the offense set forth in the

_____

[4]At least one other court is in accord with our analysis. See Ring, 706 F.3d at 467.

indictment are altered, either actually or in effect, by the prosecutor or the court after the grand jury has passed on them." United States v. Begnaud, 783 F.2d 144, 147 n.4 (8th Cir. 1986). Reviewing the record de novo, see United States v. Renner, 648 F.3d 680, 686 (8th Cir. 2011), we conclude that there was no amendment because the government sought to prove at trial what it alleged in the indictment: that Suhl paid Jones with an intent to influence official acts.

### 3. Jury Instructions

Suhl raises three objections to the jury instructions. He claims that (1) the honest-service bribery instructions did not require the jury to find that he bribed Jones *in exchange for* an official act; (2) the federal-funds bribery instruction did not require an official act at all; and (3) the federal-funds bribery instruction failed to identify a specific business transaction valued at $5,000 or more. "[W]e review jury instructions for abuse of discretion, and will affirm the district court if the instructions, as a whole, sufficiently submit the issues to the jury." United States v. Rush-Richardson, 574 F.3d 906, 910 (8th Cir. 2009) (quoting United States v. Farish, 535 F.3d 815, 821 (8th Cir. 2008)).

#### i. Honest-services Bribery

A bribe is complete when payment is offered or made with "a specific intent to give . . . something of value in exchange for an official act." Sun-Diamond, 526 U.S. at 404–05 (emphasis omitted). Suhl argues that the honest-services bribery instruction did not require the jury to find that he paid Jones *in exchange for* an official act.

The instructions required the jury to find that Suhl "made . . . or offered payments with the intent that Mr. Jones, who in his capacity as deputy director of

[ADHS], would take official actions that would benefit Mr. Suhl and his businesses." The instructions also explained that Jones need not have completed an official act: "It is sufficient if Mr. Suhl knew that the money was offered with the intent to induce performance of an official act by Mr. Jones." The phrase "scheme to defraud" was further defined as "any plan or course of action intended to deceive or cheat another out of the right to honest services where a bribe is paid with the intent that Mr. Jones take official action or an official act." As Suhl points out, the phrase "in exchange for" is not in the instructions as given. But Suhl offers no support for the assertion that this specific phrase must be included when the instructions otherwise convey the quid pro quo required in a case against a payor defendant. See Sun-Diamond, 526 U.S. at 404–05 ("Bribery requires intent 'to influence' an official act. . . . In other words, for bribery there must be a *quid pro quo*—a specific intent to give . . . something of value *in exchange* for an official act." (emphasis in original)). Read as whole, the instructions fairly submitted the quid pro quo element to the jury.[5]

---

[5]It is not entirely clear, but Suhl may also argue that the federal-funds bribery instruction omitted the quid pro quo element. Assuming without deciding that § 666 requires a quid pro quo exchange, we find the federal-funds instructions did include the element by defining "corruptly" as acting "with the intent that something of value be given or offered to influence an agent of the state in connection with the agent's official duties." See United States v. Jennings, 160 F.3d 1006, 1019 (4th Cir. 1998) (explaining that "a court need not resort to Latin to make this point. It simply may explain that the defendant must have intended for the official to engage in some specific act (or omission) or course of action (or inaction) in return for the charged payment."). Read in conjunction with the language that required the jury to find that Suhl paid Jones in connection with "ADHS's oversight of Mr. Suhl's businesses and its Medicaid reimbursements to his businesses," the instruction fairly presented the quid pro quo element to the jury.

-10-

## ii.     Federal-funds Bribery: Official Act

Suhl asserts that the federal-funds bribery instructions failed to require an official act as that term is defined in McDonnell.[6] We again decline to decide whether the § 201(b)(1) official act element applies to § 666 because we need not answer that question to decide the issue before us. Assuming that § 666 requires an official act, the instructions required the jury to find one. The instructions required the jury to find that Suhl "corruptly gave, offered, or agreed to give money to Steven Jones in connection with some business, transaction, or series of transactions of ADHS, *i.e.*, ADHS's oversight of Mr. Suhl's businesses and its Medicaid reimbursement of his businesses . . . ." Jones's oversight and reimbursement of Suhl's businesses involve the sort of formal exercise of governmental power that the Supreme Court required of the bribery convictions in McDonnell, 136 S. Ct. at 2369. Accordingly, the instructions sufficiently submitted the official act issue to the jury.

## iii.     Federal-funds Bribery: Specific Transaction

Suhl argues that the federal-funds bribery instruction failed to require that his payments to Jones be connected to a specific business or transaction valued at over $5,000. But this court has previously rejected Suhl's reading of § 666. Section 666 permits conviction for corrupt payment "in connection with any business, transaction

---

[6]Suhl contends that this court required an official act under § 666 in United States v. Zimmerman, 509 F.3d 920 (8th Cir. 2009). We disagree. In Zimmerman, we explained that the portion of the statute dealing with *payee* defendants, § 666(a)(1)(B), "prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action." Id. at 927. The words "official action" merely summarized § 666's statutory requirements in the course of distinguishing bribes from illegal gratuities. Id.; see also Sun-Diamond, 526 U.S. 526 at 404–05. Zimmerman did not apply § 201 "official acts"—which were at issue in McDonnell—to § 666 as a whole or to the portions dealing with payor defendants.

or series of transactions . . . involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). We have explained that it is "not necessary for the government to link any particular payment to any particular action undertaken by" the government agent, and the bribe "may be paid with the intent to influence a general course of conduct." United States v. Redzic, 627 F.3d 683, 692 (8th Cir. 2010). The instruction properly stated the law.[7]

## B.    Evidentiary Rulings

Suhl alleges error in two of the district court's evidentiary rulings. First, he argues that keeping the details of Carter's voter fraud conviction away from the jury violated his rights under the Confrontation Clause. Second, he argues the district court erred in refusing to admit evidence of his and his family's long history of donating to Christian causes.

We review Confrontation Clause claims de novo. United States v. Holmes, 620 F.3d 836, 840 (8th Cir. 2010). The Confrontation Clause requires that a criminal defendant be given the right to be "confronted with the witnesses against him." U.S. Const. amend. VI. In other words, the defendant must be "given a full and fair *opportunity* to probe and expose [an opposing witness'] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Delaware v. Fensterer, 474 U.S. 15, 22 (1985) (per curiam) (emphasis added).

---

[7]Suhl also argues that, because the district court's § 666 instructions were wrong, his conviction for interstate travel in furtherance of bribery must also be reversed. Because we find that the district court did not abuse its discretion in instructing the jury on the federal-funds bribery count, we reject this claim.

The jury heard that Carter had previously been convicted of voter fraud, and Suhl cross-examined him about his plea deal on that charge. The district court prohibited Suhl from probing the particulars of that conviction while cross-examining both Carter and an FBI agent. Suhl contends that in doing so, the district court denied him the opportunity to confront his accuser. But Suhl received that opportunity when he extensively cross-examined Carter. Suhl asked Carter about his voter fraud conviction and his agreement with the government. Carter admitted that the government allowed him to plead to only one count of voter fraud, charged him with only one count of bribery in connection with the Suhl scheme, and promised not to charge him with any other crimes if he testified truthfully against Suhl. Carter also testified that he hoped for an "immediate release" from prison if he provided "substantial assistance" against Suhl.

Suhl wanted to cross-examine Carter about the details[8] of his prior voter fraud conviction, but "a district court may impose reasonable limits on cross-examination based on concerns about prejudice or confusion of the issues." United States v. Sigillito, 759 F.3d 913, 938 (8th Cir. 2014) (quoting United States v. Jasso, 701 F.3d 314, 317 (8th Cir. 2012)). "The Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Watson, 650 F.3d 1084, 1089 (8th Cir. 2011) (quoting Fensterer, 474 U.S. at 20). Here, the district court did not limit Suhl's ability to expose Carter's motives for testifying against him, and excluding potentially distracting testimony about the details of Carter's prior unrelated criminal activity did not impermissibly limit Suhl's opportunity to confront his accuser. Any similar limitation on the testimony from the FBI agent was likewise permissible.

_____

[8]The only details Suhl identifies on appeal are that Carter had engaged in voter fraud "in connection with at least fourteen other elections," and received a "50% reduction in sentence . . . in part for his cooperation against Suhl."

As to the district court's exclusion of evidence detailing the Suhl family's long history of giving to Christian causes, we review for an abuse of discretion. Watson, 650 F.3d at 1088. Suhl argues that this evidence was crucial to his defense because his track record of philanthropy undermined the government's theory that his payments to Carter's church were really bribes for Jones. We agree that evidence of Suhl's philanthropy was relevant to the issue of intent, but Suhl was allowed to introduce evidence of his regular contributions to Carter's church that were made long before the allegations contained in the indictment. Suhl himself testified that he was a frequent contributor to Christian causes. And Suhl's mother testified that Suhl's payments to Carter's church were not bribes, but were part of the family's long-running benevolence. Under these circumstances, we are reluctant to conclude that the district court abused its discretion in excluding the proffered evidence.

Nevertheless, evidentiary errors are harmless if they have only slight influence on the verdict and do not affect the defendant's substantial rights. United States v. McPike, 512 F.3d 1052, 1055 (8th Cir. 2008). Harmlessness analysis considers the disputed evidence "in the overall context of the government's case." United States v. Worman, 622 F.3d 969, 976 (8th Cir. 2010). Here, the record contained strong evidence that Suhl's payments to Carter's church were exactly what the government said they were: bribes that Suhl intended to exchange for Jones's official acts. Multiple wire-tapped conversations documented Suhl's repeated attempts to pay Jones to take official action to help out his companies. At most, exclusion of any additional evidence on the philanthropy issue had but a "slight influence" on the jury's verdict.[9]

_____

[9]During deliberations, the jury asked whether Suhl belonged to Carter's church, whether Suhl belonged to any other church, and whether Suhl gave money to other churches. Suhl contends that the jury's questions prove prejudice, but he focuses only on the last of the three questions. Suhl does not argue that the district court excluded evidence that would have provided an answer to the first two questions. The jury's question about contributions was not answered directly at trial, but three

-14-

## D. Sentencing

Finally, Suhl objects to the way the district court calculated the loss caused by his bribery scheme. We review the district court's interpretation of the Sentencing Guidelines de novo and its loss calculation for clear error. United States v. Martinez, 690 F.3d 1083, 1086 (8th Cir. 2012).

The Sentencing Guidelines increase a defendant's offense-level based on the amount of loss that resulted from his crime. See USSG § 2C1.1(b)(2); see also USSG § 2B1.1(b)(1). The Guidelines provide several methods for calculating loss; two are relevant here. The first is the value of the bribe payment. USSG § 2C1.1(b)(2). The second is the benefit to be received from the bribe payment. Id. The "general rule is that 'loss is the greater of actual or intended loss.'" United States v. Mitchell, 608 F.3d 384, 387 (8th Cir. 2010); see also USSG § 2B1.1 cmt. n.3(A) (defining intended loss as "the pecuniary harm that the defendant purposely sought to inflict . . . [including] pecuniary harm that would have been impossible or unlikely to occur . . . ."). The district court need not achieve scientific certitude in estimating loss; it need only "reasonably estimat[e] the loss using a preponderance of the evidence standard." Martinez, 690 F.3d at 1087 (quoting United States v. Alexander, 679 F.3d 721, 731 (8th Cir. 2012)).

In this case, the district court found that Suhl intended for Jones to divert all of the juvenile Medicaid cases in northeastern Arkansas to one of his companies between 2011 and 2012. The court looked at Suhl's company records and determined that Suhl reaped a profit of 2.9% on Medicaid reimbursements in 2011, and a 0.9% profit in 2012. The court then multiplied those profit margins by the 2011 and 2012

witnesses testified that Suhl had a reputation as a very generous contributor to Christian causes. The jury's questions do not render the district court's decision to limit evidence of Suhl's charitable giving an abuse of discretion.

Medicaid reimbursements received by the competitor from whom Suhl wanted Jones to divert clients. The court then added the 2011 and 2012 estimated profit totals together to get an estimated intended loss of $176,820.

This calculation is indeed an estimate, but it is sufficiently reasonable to avoid clear error. Intended losses are frequently difficult to calculate. Here, the district court based its calculations on concrete information: wiretaps of Suhl's calls that indicate his intent, the Medicaid profit margin of Suhl's company, and the Medicaid reimbursements received by Suhl's competitor. The resulting loss estimate was reasonable.

Suhl contends that the facts do not back up the district court's calculation. Suhl argues that there is no evidence that Jones could get *all* of the juvenile Medicaid patients in northeastern Arkansas referred to Suhl's company. But the district court's loss calculation was based on the loss that Suhl *intended*, and USSG § 2C1.1(b)(2) does not require that a defendant be successful in causing the losses he intends. A preponderance of the evidence indicates that Suhl paid Jones with intent that Jones divert all the Medicaid cases to his company. Suhl also asserts that he did not request a change in the referral policy until July 2011, rendering losses from the first several months of 2011 irrelevant. But the evidence indicates that Suhl first asked Jones to divert patients in 2010. The district court's loss calculation was not clearly erroneous.

## III. Conclusion

The judgment of the district court is affirmed.

_____