**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

SHEN ZHEN NEW WORLD I, LLC,

*Defendant - Appellant*.

No. 23-972

D.C. No.
2:20-cr-00326-
JFW-4

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted July 19, 2024
Pasadena, California

Filed September 11, 2024

Before: Kim McLane Wardlaw, Richard A. Paez, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

# SUMMARY[*]

## Criminal Law

The panel affirmed a real estate development company's convictions on three counts of honest services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346; one count of federal-program bribery, in violation of 18 U.S.C. § 666(a)(2); and four counts of interstate and foreign travel in aid of racketeering, in violation of the Travel Act, 18 U.S.C. § 1952(a)(3).

The company, Shen Zhen New World I, LLC ("Shen Zhen"), was owned and operated by Chinese billionaire Wei Huang who, for nearly forty years, lavished extravagant Las Vegas hotel stays, gambling chips, and prostitutes on then-Los Angeles City Councilmember Jose Huizar. Shen Zhen sought to redevelop the L.A. Grand Hotel into Los Angeles's tallest skyscraper. Huang's right-hand man confided in Huizar's aide that Huang's strategy was to "give, give, give" so that he could later make a "big ask" for Huizar's support on the redevelopment project.

The panel held that sufficient evidence supports the convictions. The panel rejected Shen Zhen's argument that the Government's failure to establish either an agreement between the parties or any official action by Huizar taints all of the counts against the company. When based on bribery, conviction for honest-services fraud requires proof of the bribe-giver's intent to enter a quid pro quo. But the bribery offense does not require an agreement to enter a quid pro quo

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with the public official when the defendant is the bribe-giver. A defendant offering a benefit to a public official with the intent to influence any official act in exchange suffices. Viewing the evidence in the light most favorable to the prosecution, the evidence at trial was more than sufficient to support conviction for honest-services fraud. The same evidence also supports Shen Zhen's convictions for federal-program bribery and Travel Act violations, which entail the same or more permissive mens rea requirements.

The panel held that the district court did not err in its jury instructions. Shen Zhen argued that the district court denied it a fair trial by refusing to give its proposed instruction on a quid pro quo. The panel wrote that the proposed instruction was not legally sound because bribery does not require an agreement to enter a quid pro quo with the public official; that Shen Zhen's reliance on campaign-contribution precedents does not alter this conclusion; that a proposed instruction requiring the jury to find that Huizar clearly identified "specified official acts" was also legally unsound; and that a proposed instruction on the difference between unlawful bribery and "lawful ingratiation" was unnecessary.

The panel affirmed Shen Zhen's Travel Act convictions. Shen Zhen argued that California's bribery statutes are too broad to serve as predicates under the "categorical approach" required under the Travel Act. The panel determined that, as construed by the California courts, bribery under California law is broader than the Travel Act's generic definition of bribery. The panel held, however, that the mismatch between the generic definition of bribery under the Travel Act and California bribery statutes do not require vacating Shen Zhen's convictions because the jury convicted Shen Zhen based on elements that conform to the generic definition of bribery under the Travel Act.

The panel held that the district court properly admitted evidence of Huizar's general-pay-to-play scheme but wrongly excluded Huang's alleged statements about his state of mind regarding his gift-giving. The panel concluded that the error was harmless and does not warrant reversal of the jury's verdict.

**COUNSEL**

Susan S. Har (argued), James J. Buxton, Brian R. Faerstein, and Veronica Dragalin, Assistant United States Attorneys, Public Corruption & Civil Rights Section; Rajesh R. Srinivasan and Patrick Castaneda, Assistant United States Attorneys; David R. Friedman, Criminal Appeals, Section; Mack E. Jenkins and Bram M. Alden, Assistant United States Attorneys, Chiefs, Criminal Division; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Jacob M. Roth (argued), Harry S. Graver, and Alexis Zhang, Jones Day, Washington, D.C.; Richard M. Steingard, Law Offices of Richard M. Steingard, Los Angeles, California; Defendant-Appellant.

## OPINION

SANCHEZ, Circuit Judge:

For nearly four years, Chinese billionaire Wei Huang lavished extravagant Las Vegas hotel stays, gambling chips, and prostitutes on then-Los Angeles City Councilmember Jose Huizar.  Huang owned and operated Defendant-Appellant Shen Zhen New World I, LLC ("Shen Zhen"), a real estate development company, that sought to redevelop the L.A. Grand Hotel into Los Angeles's tallest skyscraper. Huizar was not only the councilmember of the district that encompassed the hotel but also a key figure on committees that oversaw all development in the city.  Huang's right-hand man confided in Huizar's aide that Huang's strategy was to "give, give, give" so that he could later make a "big ask" for Huizar's support on the redevelopment project.

In 2022, a federal jury convicted Shen Zhen on three counts of honest-services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346; one count of federal-program bribery, in violation of 18 U.S.C. § 666(a)(2); and four counts of interstate and foreign travel in aid of racketeering, in violation of the Travel Act, 18 U.S.C. § 1952(a)(3).  Although indicted along with Shen Zhen, Huang never stood trial and remains a fugitive in China. Shen Zhen now makes four arguments on appeal: (1) the Government failed to present sufficient evidence to support the jury convictions; (2) the district court abused its discretion in formulating its jury instructions for quid pro quo bribery; (3) California's bribery statutes served as improper predicate offenses for Shen Zhen's Travel Act convictions; and (4) the district court's evidentiary rulings warrant reversal.  The district court had jurisdiction pursuant

to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We affirm.

I.

In 2010, Shen Zhen bought downtown Los Angeles's L.A. Grand Hotel for $63 million.  As confirmed by Huang's right-hand man Ricky Zheng, Huang hoped to transform the 13-story hotel into a 77-story mixed-use skyscraper that would constitute the tallest tower in Los Angeles.

Then-Los Angeles City Councilmember Jose Huizar held substantial authority over development in downtown Los Angeles.  The 15-member Los Angeles City Council approves land-use "entitlements," or city permissions to build large-scale projects.  Huizar was the councilmember for Council District 14, which includes the downtown area that contains the L.A. Grand Hotel.  Other councilmembers typically defer to the district councilmember's preferences regarding a real estate project in that member's district. Huizar also chaired the Planning and Land Use Management Committee ("PLUM"), which hears and votes on entitlements before providing recommendations to the full City Council.  As PLUM chair, Huizar set the committee's agenda and determined if the committee would consider a project.  Finally, Huizar was on the Economic Development Committee that approves Transient Occupancy Tax rebates for large-scale hotels.  Real estate developers were thus vying for meetings with Huizar and jockeying for his support during the 2010s—a period of significant commercial real estate growth in downtown Los Angeles.

Councilmember Huizar was concurrently running a "pay-to-play" bribery scheme with Los Angeles developers. Huizar's office treated developers who provided Huizar with money and perks as "friends of the office," leveraging his

power to advance their projects. Huizar's aide George Esparza testified that he tracked requests from "friends of the office" and relayed Huizar's requests for benefits to developers. Developers who failed to pay got "no play," and Huizar "would essentially pay no attention to their project."

In 2013, Raymond Chan—a member of the Los Angeles Department of Building and Safety and a friend of Huang's—introduced Huang to Huizar over dinner. Huang's assistants and Esparza also attended. Chan explained to Huang that Huizar was the councilmember for Council District 14, the PLUM chair, and ultimately the "big boss" of downtown. Huang spoke limited English, often communicating through bilingual associates, but responded "very, very good" and gave a thumbs up. Esparza told Zheng on multiple occasions over the coming years that Huizar "could essentially make or break" a development project.

Huang understood Huizar's power. The redevelopment of the L.A. Grand Hotel required approximately four entitlements overseen by PLUM and City Council: (1) a specific plan project permit; (2) a "vesting tentative tract" that allowed a developer to use a building for multiple uses, such as a hotel and apartments; (3) the "Transfer of Floor Area Rights" that allowed developers to add floors to a building; and (4) a permit for the sale and service of alcohol. Huang told Zheng and other employees that it was "very important" to have Huizar's support based on his ability to expedite and approve the L.A. Grand Hotel's redevelopment.

Soon after their first meeting, Huang began inviting Huizar to all-expense-paid trips to Las Vegas. These trips included flights on a private jet, luxury hotel villas with private pools, tens of thousands of dollars in gambling chips,

Rolls-Royce car services, expensive food and alcohol, private casino hosts, and prostitutes. Huang called Huizar "the VIP within the group" and treated him accordingly, sitting next to Huizar in the Rolls-Royce, serving him first at dinner, allowing him to pick the wine, providing him the most gambling chips, and giving him "first pick" of the prostitutes. Huang gave Huizar approximately $260,000 in gambling chips over the course of four years and 20 trips to Las Vegas. Huizar also joined Huang on other all-expense-paid trips—what the Defense itself describes as "a gambling junket to Australia and a golf outing to Pebble Beach." Zheng told Esparza that Huang's plan with Huizar was to "give, give, give" as an "investment" until the time was right to make the "big ask" for Huizar's support on the redevelopment project.

Huang's lavish gift-giving quickly made him a "friend of the office" and "top priority" for Huizar. Huang frequently made requests of Huizar en route to Las Vegas in the private jet or soon after returning. Huizar's support to Huang included ensuring that permits for the initial multi-million-dollar renovations of the L.A. Grand Hotel were "handled properly," helping negotiate the purchase of an adjacent parking lot, resolving union disputes, issuing a city certificate honoring a boarding school located in the L.A. Grand Hotel, and holding a press conference for the school.

Huang and Huizar attempted to conceal the nature of their close relationship. Huizar had trained Esparza to tell developers that something was "important to the councilmember" to solicit a bribe, rather than "directly say, hey, we want this contribution for this vote." For their Las Vegas trips, Huang's associates used false names for Huizar on the private jet's flight manifests, while Esparza would cash out Huizar's gambling chips in inconspicuous amounts

and give Huizar the cash in the bathroom.  During a 2015 trip to the Palazzo casino, casino staff recognized Huizar and requested that he sign a form affirming that he was not gambling with public funds; Huizar refused and instead left the casino floor.  Huang subsequently stopped bringing Huizar to Las Vegas for a "cooling-off period" because they wanted to "be careful."

Huang also assisted Huizar with a hush-money payment after a sexual-harassment lawsuit threatened Huizar's 2015 reelection campaign.  A former staffer had sued Huizar for sexual harassment in late 2013, and Huizar sought money from Huang "to silence the other side."  During ongoing discussions for the settlement money in 2014, Huizar moved and voted for a resolution honoring Huang's "achievements" in a City Council proceeding.  The resolution, which the rest of City Council seconded, thanked Huang "for the contributions he has and will continue to make to [the] economy of the Fourteenth District."

In an attempt to keep Huang's assistance in Huizar's sexual harassment lawsuit "discreet and confidential," Huang funneled a $600,000 payment through a foreign shell company and directed a Shen Zhen accounting employee to wire the funds to a disbarred attorney and eventually to an account at East West Bank in Pasadena.  This payment became the collateral for a private loan, which Huizar used to settle his lawsuit.[1]  Huizar later won reelection and flew to Las Vegas with Huang to celebrate.  At a Las Vegas hotel

---

[1] Huizar then made interest-only payments on this loan with other cash he received from Huang.  Following the corruption revelations against Huizar, the East West Bank seized the collateral and Huizar never paid Huang back for the $600,000 payment.

villa, Huizar thanked Huang for saving his political career with the settlement money.

The year after Huizar's reelection, Huang made his "big ask." Huang informed Huizar of his plans to convert the L.A. Grand Hotel into a 77-floor mixed-use skyscraper. Huang held meetings with architects, a real estate firm, and consultants about the redevelopment in 2016, projecting that he could finish the billion-dollar project by 2020 or 2021. During a cigarette break with Huizar and staff at the Sheraton Hotel that Huang also owned, Huang asked for Huizar's support on the redevelopment of the L.A. Grand Hotel. Esparza testified that Huizar pledged "100 percent support" to Huang for the project and explained what he could do as the PLUM chair, including changing any necessary ordinances, rezoning the project, and granting entitlements for Huang to "go as high as he wants."

Huizar began using his office to support the L.A. Grand Hotel redevelopment project. On August 4, 2016, Huizar organized a City meeting at Huang's request to discuss the project. In attendance were Huizar and his staff, Huang and his project team, the Deputy Mayor, and the heads of two City departments responsible for major redevelopment work. Huang's team presented its redevelopment plan, and attendees discussed City programs such as Transfer of Floor Area Rights and Transient Occupancy Tax rebates. After the meeting, Huang asked Huizar for an official letter that would help finance the project. Huang provided Huizar with a draft letter trumpeting the redevelopment and the August 4 City meeting. Huizar signed off on the letter despite misrepresentations as to a "civic hearing" that never occurred and false urgency about the status of the project's application. Huizar also steered Huang away from a land-use consultant who was not loyal enough to Huizar. Their

Las Vegas trips together continued throughout, including one trip taken the day after the August 4 City meeting.

The scheme began to unravel in February 2017, when Huang learned from a Ceasars Palace hostess that the Federal Bureau of Investigation ("FBI") was investigating Huizar. Huang instructed Zheng that there would be no more trips to Las Vegas with Huizar. Huang also found out that Huizar was involved in another sexual affair, which Huang complained was "no good" for the L.A. Grand Hotel redevelopment because he had "all his eggs in one basket with Jose Huizar." Huang sought to court another city councilmember by taking him to Las Vegas, while he supported Huizar's wife in the 2020 election to fill Huizar's seat as he had termed out of office. In November 2018, the FBI executed search warrants at Huizar's office and home and interviewed Huang about the investigation into Huizar. The FBI also interviewed Zheng and seized his phone. When Zheng informed Huang, Huang expressed alarm that the FBI "may find him." The following day, Huang fled to China, where he remains a fugitive.

In November 2020, a grand jury indicted Shen Zhen, Huang, Huizar, and three others on 41 counts related to the corruption enterprise. The counts against Shen Zhen consisted of three counts of honest-services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346; one count of federal-program bribery, in violation of 18 U.S.C. § 666(a)(2); and four counts of interstate and foreign travel in aid of racketeering, in violation of the Travel Act, 18 U.S.C. § 1952(a)(3). The district court granted defendants' motions for severance after determining that the Government failed to present sufficient evidence that "a single scheme exist[ed]" involving all defendants and there

was "a significant danger that defendants [would] be severely prejudiced by a joint trial with their co-defendants."

With Huang remaining a fugitive in China, the ten-day trial against Shen Zhen began on October 27, 2022. The jury deliberated for approximately four hours before convicting Shen Zhen on all counts. Shen Zhen now appeals its convictions.

## II.

We review de novo the sufficiency of the evidence supporting a conviction. *United States v. Kimbrew*, 944 F.3d 810, 813 (9th Cir. 2019). This review is "highly deferential" to the jury's verdict. *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc). Evidence is sufficient if, after viewing it "in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). A reviewing court draws "all reasonable inferences" in favor of the government and resolves "any conflicts in the evidence . . . in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

Shen Zhen challenges the sufficiency of the evidence on the ground that it "did not commit federal 'bribery.'" It argues that federal bribery requires a "quid pro quo for official action" but the Government proved at trial nothing more than "lawful ingratiation." Shen Zhen asserts that the Government's failure to establish either an agreement between the parties or any official action by Huizar taints all of the counts against the company, necessitating acquittal or a new trial. We disagree.

When based on bribery, conviction for honest-services fraud requires proof of the bribe-giver's intent to enter a quid pro quo. The federal bribery statute, 18 U.S.C. § 201, criminalizes "directly or indirectly, corruptly giv[ing], offer[ing] or promis[ing] anything of value to any public official . . . with intent" "to influence any official act," "to influence such public official" to commit fraud on the United States, or "to induce such public official . . . to do or omit to do any act in violation of the lawful duty of such official." *Id.* § 201(b)(1); *see also McDonnell v. United States*, 579 U.S. 550, 562 (2016).[2] Bribery contemplates a quid pro quo; that is, bribery requires the "specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999); *see also United States v. Garrido*, 713 F.3d 985, 996–97 (9th Cir. 2013). But conviction for federal bribery does not require that an official act be performed by the public official receiving the bribe. *See McDonnell*, 579 U.S. at 572 ("[A] public official is not required to actually make a decision or take an [official] action . . . ; it is enough that the official agree to do so."). Rather, the crime of bribery is completed when the bribe-giver offers or gives something of value to the public official with the requisite "intent to influence an official act." *Sun-Diamond*, 526 U.S. at 404 (internal quotation marks omitted). This showing conforms to the plain language of the honest-services fraud statute, which prohibits any "scheme or artifice to defraud" that "deprive[s] another [such as a public official's

---

[2] While 18 U.S.C. § 201 by its terms applies only to federal "public official[s]," *id.* § 201(a)(1), section 666 extends the prohibition against bribery to state and local officials employed by agencies that receive federal funds. *See Salinas v. United States*, 522 U.S. 52, 58 (1997).

constituents] of the intangible right of honest services."  18 U.S.C. § 1346; *see also McDonnell*, 579 U.S. at 562–63.

In challenging its conviction, Shen Zhen conflates the specific intent required of a bribe-giver with that of the *bribe-taker*, i.e., a public official.  A public official is guilty of bribery if he agrees to "receive[] a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return."  *McDonnell*, 579 U.S. at 572.  The bribe-taking official need not "intend to perform the 'official act,' so long as he agrees to do so."  *Id.* Furthermore, "[t]he agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."  *Id.*

When the defendant is the *bribe-giver*, however, the bribery offense does not require an agreement to enter into a quid pro quo with the public official.  Under the plain terms of § 201, the bribe-giver commits bribery when he "corruptly gives, offers or promises anything of value to any public official" "with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1).  Thus, "[t]he crime of offering a bribe is completed when a defendant expresses an ability and a desire to pay the bribe."  *United States v. Rasco*, 853 F.2d 501, 505 (7th Cir. 1988).

In *United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018), the defendant was convicted of bribing an Arkansas state official.  Relying on *United States v. McDonnell*, the Eighth Circuit distinguished the intent requirement for the bribe-giver from that of the bribe-taker.  *Id.* at 1109, 1112.  The court held, "Neither [§§ 201, 666], nor *McDonnell*, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act."  *Id.* at 1113. Rather, "[a] payor defendant completes the crimes of honest-

services and federal-funds bribery as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement." *Id.*

Several of our sister circuits have drawn the same mens rea distinction between bribe-givers and bribe-takers that *Suhl* adopted. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) (noting there need not be a "meeting of the minds between the payor and the official as to the corrupt purpose of the payments"); *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) (A bribe-giver is guilty of honest-services bribery "where he offers an official something of value with a specific intent to effect a quid pro quo even if that official emphatically refuses to accept."); *Rasco*, 853 F.2d at 505; *cf. United States v. Lindberg*, 39 F.4th 151, 172 (4th Cir. 2022) (Section 666 criminalizes the act of a bribe-giver who "intended for the official to engage in some *specific* act" in return for payment (citation omitted)). Thus, a defendant offering a benefit to a public official with the intent "to influence any official act" in exchange suffices for federal bribery charges. 18 U.S.C. § 201(b)(1)(A); *see also id.* § 666(a)(2); *Sun-Diamond*, 526 U.S. at 404–05**.**

Viewing the evidence in the light most favorable to the prosecution, *see Jackson*, 443 U.S. at 319, the evidence at trial was more than sufficient to support conviction for honest-services fraud. The Government demonstrated Huang's specific intent to acquire the L.A. Grand Hotel to build a 77-story mixed-use skyscraper that would constitute the tallest tower in Los Angeles, and Huang viewed Huizar as "an investment" in his plan. The evidence established that Shen Zhen provided benefits—amounting to over one million dollars—to Huizar intending to receive official

action supporting Huang's L.A. Grand Hotel redevelopment project. Huang took Huizar on over a dozen all-expense-paid trips to Las Vegas, furnished him with hundreds of thousands of dollars in gambling chips, expensive food and alcohol, and prostitutes, and helped settle Huizar's sexual harassment lawsuit with a $600,000 payment—all in exchange for Huang's "big ask": official support from Huizar on the redevelopment of the L.A. Grand Hotel.

Shen Zhen argues that the quid pro quo must be clear to distinguish bribery from "goodwill gift[-giving]." Shen Zhen explains that "something is a bribe (or not) 'at the time' the gift is given," and a "gift cannot *become* a bribe retrospectively." As discussed above, however, all that the law requires to establish bribery is a defendant's specific intent to receive future official acts on a specific matter at the time the defendant pays or offers something of value in return. *See Sun-Diamond*, 526 U.S. at 404–05; *Rasco*, 853 F.2d at 505; *Suhl*, 885 F.3d at 1113. Huang did not need to voice his requests for official action explicitly at the same moment he paid for Huizar's trips to Las Vegas or provided other benefits. Instead, as the evidence showed, Huang's intent was to "give, give, give" before making the "big ask," an intent made clear by Esparza's testimony that Huizar agreed to "100 percent support" the redevelopment project through official acts such as changing ordinances, rezoning the building, and moving the project through the PLUM committee he chaired.[3]

---

[3] Shen Zhen's concern—that ingratiation may be misconstrued as bribery in retrospect—is misplaced. Under §§ 201 and 666, a bribe must be "corruptly" given or offered with the specific intent to influence official action. *See Lindberg*, 39 F.4th at 172. This mens rea

Huizar's official act prior to Huang's "big ask" also supports the jury's verdict. An "'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'" that "involve[s] a formal exercise of governmental power that is similar in nature to . . . a hearing before a committee." *McDonnell*, 579 U.S. at 574 (quoting 18 U.S.C. § 201(a)(3)). Again, "[t]he agreement need not be explicit, and the public official need not specify the means" for an official act. *Id.* at 572. During the discussions with Huang over the lawsuit settlement payment, Huizar moved and voted for a City resolution honoring Huang in a formal City Council proceeding. Although "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act,'" this resolution was "a formal exercise of governmental power" so as to qualify as an official act. *Id.* at 574. The Government argued that the official City resolution bolstered Huang's professional reputation with the City Council, which was to later vote on his redevelopment project. The jury, in its special verdict form, found that Shen Zhen had provided financial benefits to Huizar with the specific intent of receiving an "official act": Huizar's introduction and vote on a City resolution that would enhance Shen Zhen and Huang's "professional reputation and marketability" in Los Angeles and benefit

---

requirement protects against the possibility that goodwill gift-givers, harboring no intent to receive official action in exchange for their gifts, will later be deemed to have given a bribe.

Shen Zhen's redevelopment of the L.A. Grand Hotel.[4] Substantial evidence supports the jury's official act finding.

Finally, a reasonable jury could find that Huang's concealment efforts evinced his intent to commit bribery in support of the jury's verdict. The evidence established that Huang gave Huizar gambling chips in private VIP rooms, Huang knew that Huizar had directed Esparza to cash out the chips, Huang's associates listed false names for Huizar during their trips, and Huang sought a "cooling-off period" for their Las Vegas trips after Palazzo casino security personnel confronted Huizar. Huang also concocted a scheme to provide Huizar with a $600,000 payment to settle a sexual harassment lawsuit through a shell company and a disbarred attorney's trust account. These facts support the jury's finding that Huang, as the owner and agent of Shen Zhen, acted with the requisite corrupt intent to commit bribery.

The same evidence also supports Shen Zhen's convictions for federal-program bribery (18 U.S.C. § 666(a)(2)) and Travel Act (18 U.S.C. § 1952(a)(3)) violations, which entail the same or more permissive mens rea requirements. *See* 18 U.S.C. § 666(a)(2) (prohibits corruptly giving benefit "with intent to influence or reward"); *Garrido*, 713 F.3d at 996 ("[Section] 666 does not require a jury to find a specific *quid pro quo*."); *Perrin v. United States*, 444 U.S. 37, 42 (1979) (construing Travel Act

---

[4] Huizar also convened multiple meetings and held a press conference for Huang, in addition to signing a letter to help Huang with the financing of L.A. Grand Hotel's redevelopment. While these constituent services are not "official acts" under § 201(a)(3), they are probative of Shen Zhen's intent to influence an official act in furtherance of the hotel's redevelopment. *See McDonnell*, 579 U.S. at 573.

to make a "federal offense to travel or use a facility in interstate commerce to commit 'extortion [or] bribery . . . in violation of the laws of the State in which committed or of the United States.'" (quoting 18 U.S.C. § 1952(b))). [5] Because a rational factfinder "could have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319, we hold that sufficient evidence supports Shen Zhen's jury convictions.

## III.

We review for abuse of discretion a district court's formulation of the jury instructions but review de novo whether the instructions misstate the law and adequately cover the defense's theory of the case. *United States v. Rodriguez*, 971 F.3d 1005, 1017 (9th Cir. 2020); *United States v. Flucas*, 22 F.4th 1149, 1154 (9th Cir. 2022). "[A] defendant is entitled to an instruction concerning [its] theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility," as long as a jury "could rationally sustain the defense." *United States v. Kayser*, 488 F.3d 1070, 1076 (9th Cir. 2007)

---

[5] Prior to oral argument, Shen Zhen submitted a supplemental authority letter citing the Supreme Court's recent decision in *Snyder v. United States*, 144 S. Ct. 1947 (2024). *Snyder* is inapposite, as it concerns an alleged bribe-taker (a local mayor) under 18 U.S.C. § 666(a)(1), not a bribe-giver under § 666(a)(2). *See Snyder*, 144 S. Ct. at 1954–55. *Snyder* also held that § 666(a)(1)(B) does not make it a "federal crime for state and local officials to accept *gratuities* for their *past* official acts." *Id.* at 1954 (emphases added). As Defendant concedes, "*Snyder* specifically excluded *gratuities* from [§ 666's] scope" whereas "this case instead involves goodwill gifts." *Snyder*'s analysis of a public official's criminal liability for receiving gratuities for past official acts is irrelevant to this appeal.

(citations omitted); *see also United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011).  "A defendant is not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates what the jury has already been told."  *United States v. Kaplan*, 836 F.3d 1199, 1215 (9th Cir. 2016) (citation omitted).

Shen Zhen argues that the district court denied it a fair trial by refusing to give the jury its proposed instruction on a quid pro quo.  It contends that even assuming the Government's evidence was sufficient to deduce quid pro quo bribery, the court's jury instructions failed to distinguish between an illicit bribe and a "goodwill gift," requiring a new trial.  We conclude that the district court did not err in its jury instructions.

Shen Zhen's proposed jury instruction No. 35 stated that for "[a]ll counts," the jury would have to find that Huang provided gifts "in exchange for Councilman Huizar's agreement to take one or more of the specified official acts to benefit the L.A. Grand Hotel project."  Although Shen Zhen's theory of the case may have been that it was conducting "lawful ingratiation" and not bribery, a defendant's entitlement to an instruction requires that the theory be "legally sound." *Kayser*, 488 F.3d at 1076 (citation omitted).  Shen Zhen's proposed instruction is not legally sound because bribery does not require an agreement to enter into a quid pro quo with the public official.  *See Sun-Diamond*, 526 U.S. at 404–05; discussion *supra* Part II.

Shen Zhen's reliance on campaign-contribution precedents does not alter our conclusion.  Shen Zhen cites *Citizens United v. Federal Election Commission* for the proposition that "[i]ngratiation and access . . . are not corruption," but the Supreme Court was addressing the

distinct context of corporate political donations as a form of speech. *See* 558 U.S. 310, 360 (2010). As *Citizens United* noted, political campaign contributions enjoy unique First Amendment protections that stand in contrast to federal laws "preventing *quid pro quo* corruption." *Id.* at 361. Shen Zhen's reliance on *Buckley v. Valeo*, 424 U.S. 1 (1976) is similarly inapt because Shen Zhen's benefits to Huizar were indisputably *not* political campaign contributions and Huang—as a foreign national—was barred from making any direct or indirect campaign contributions. *See* 52 U.S.C. § 30121.

It is in the political-contributions context that the Government must prove that a defendant public official received a contribution "in return for an *explicit* promise or undertaking" to perform or not perform an official act. *McCormick v. United States*, 500 U.S. 257, 273 (1991) (emphasis added); *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 209 (2014) ("The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights."); *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 308 (2022) (same). In contrast, the Government here was required to show that a defendant *bribe-giver* possessed the "specific intent" to enter a quid pro quo for an official act at the time it offered or gave something of value to the public official. *See Garrido*, 713 F.3d at 996–97 (quoting *Sun-Diamond*, 526 U.S. at 404–05). Shen Zhen's proposed instruction thus incorrectly required the jury to find that Huizar entered into an express agreement to perform an official act.

The proposed instruction requiring the jury to find that Huizar clearly identified "specified official acts" he would perform for Huang is also legally unsound. As *McDonnell*

*v. United States* makes clear, the corrupt "agreement need not be explicit, and the public official *need not specify the means* that he will use to perform his end of the bargain." 579 U.S. at 572 (emphasis added).

Finally, Shen Zhen contends that its instruction was necessary to instruct the jury on the difference between unlawful bribery and "lawful ingratiation." The proposed instruction stated, "The fact that the person who provides the financial benefit to the public official seeks to ingratiate himself or obtain access to the public official is not sufficient." The instruction was unnecessary. The jury was already instructed on each substantive count that it had to find the requisite intent to influence an official action through the exchange of benefits, beyond general goodwill-building or ingratiation. The honest-services fraud counts required a finding of "financial benefits that defendant provided intending, at the time, to receive in exchange at least one official act by Jose Huizar in connection with the approval of the redevelopment of the L.A. Grand Hotel." The federal-program bribery counts required finding that Shen Zhen gave or offered benefits "intended to influence [Huizar or Esparza] in connection with the redevelopment of the L.A. Grand Hotel." And the Travel Act counts required finding that Shen Zhen "provided [benefits] in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the L.A. Grand Hotel." Shen Zhen was not entitled to further instruction on ingratiation "that merely duplicate[d] what the jury ha[d] already been told." *Kaplan*, 836 F.3d at 1215.

## IV.

As to the Travel Act counts, Shen Zhen argues that courts must use the generic definition of bribery at the time

Congress enacted the Travel Act in 1961, and California's bribery statutes are too broad to serve as predicates under the "categorical approach" required under the Travel Act. Shen Zhen maintains that its Travel Act convictions fail as a matter of law due to the inconsistency between the generic definition of bribery and California law. To address Shen Zhen's contentions, we first must determine the meaning of bribery under the Travel Act. Then we must determine whether there is a mismatch between bribery under the Travel Act and California law. Finally, we must determine whether any mismatch requires vacating Shen Zhen's Travel Act convictions.

## A.

"We begin with the language of the Travel Act itself." *Perrin*, 444 U.S. at 42; *see also N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299 (2017) ("Our analysis of [the statute] begins with its text."). With the statutory title of "Interstate and foreign travel or transportation in aid of racketeering enterprises," the Travel Act states:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>
> > (1) distribute the proceeds of any unlawful activity; or
> >
> > (2) commit any crime of violence to further any unlawful activity; or
> >
> > (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management,

> establishment, or carrying on, of any
> unlawful activity,

and thereafter performs or attempts to
perform [an act described above, shall be
subject to fine or imprisonment.]

18 U.S.C. § 1952(a). In turn, "unlawful activity" means, among other things, "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b). The statute does not define "bribery" or cite any other provision defining bribery. *See id.*

In the absence of an express definition in the Travel Act, Shen Zhen argues that we should look to 18 U.S.C. § 201 for a definition of "bribery." However, binding precedent forecloses this argument. In *Perrin v. United States*, the Supreme Court applied the statutory canon that "words will be interpreted as taking their ordinary, contemporary, common meaning," 444 U.S. at 42, holding that a "generic definition of bribery, rather than a narrow common-law definition, was intended by Congress" in the Travel Act, *id.* at 49. The Court then held that "Congress intended 'bribery . . . in violation of the laws of the State in which committed' as used in the Travel Act to encompass conduct in violation of state commercial bribery statutes [outlawing bribery of private individuals]." *Id.* at 50 (quoting 18 U.S.C. § 1952(b)).

We have similarly rejected the notion that "bribery" for the purposes of § 201 controls other federal bribery statutes. The defendant in *United States v. Chi* sought to confine the term "bribery of a public official" as used in the money-laundering statute, 18 U.S.C. § 1956, to "bribery" as used in § 201, "frequently referred to as 'the federal bribery

statute.'"   936 F.3d 888, 896 (9th Cir. 2019) (quoting *McDonnell*, 579 U.S. at 562).   We noted that § 201 is "merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials."  *Id.* (quoting *Sun-Diamond*, 526 U.S. at 409).   We held that "'bribery of a public official' in § 1956 is defined by that phrase's 'ordinary, contemporary, common meaning,' and is not constrained by 18 U.S.C. § 201, a statute to which § 1956 makes no reference."  *Id.* at 890–91 (quoting *Perrin*, 444 U.S. at 42).   Like § 1956, the Travel Act makes no reference to § 201 and instead refers to "bribery" as proscribed by "the laws of the State in which committed or of the United States."  18 U.S.C. § 1952(b).

Case law does support, however, the conclusion that the Travel Act proscribes a uniform type of conduct qualifying as "bribery," rather than deferring to a patchwork of state law definitions.  In *United States v. Nardello*, 393 U.S. 286 (1969), the Supreme Court interpreted "extortion" in the Travel Act and held that "the inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged."  *Id.* at 295.  Similarly, in *Taylor v. United States*, 495 U.S. 575 (1990), the Supreme Court interpreted "burglary" in a sentence-enhancement statute which lacked any definition of the term.  *See id.* at 580.  The Court held that a generic definition applied, and not the definition adopted by the state of conviction, because otherwise a defendant committing the exact same conduct would receive varying sentence enhancements depending on whether the state classified the conduct as "burglary."  *Id.* at 590–92.

We have identified a generic definition of "bribery" in a similar context.   In *Chi*, we looked to Black's Law

Dictionary and the 1962 Model Penal Code to determine the "ordinary, contemporary, common meaning" of "bribery of a public official" in 2001, when Congress passed 18 U.S.C. § 1956. *See Chi*, 936 F.3d 897 ("In 2001, the latest edition of Black's Law Dictionary defined 'bribery' as '[t]he corrupt payment, receipt, or solicitation of a private favor for official action.'" (quoting *Bribery*, Black's Law Dictionary (7th ed. 1999))).   We then listed the generic elements of public bribery as requiring (1) "two parties—one who 'paid,' 'offered,' or 'conferred' the bribe, and one who 'received,' 'solicited,' or 'agreed to accept' it"; (2) "something to be given by the bribe-giver—either a 'private favor,' a 'pecuniary benefit,' or 'any benefit'"; and (3) "something to be given by the bribe-taker—either 'official action,' 'the recipient's decision, opinion, recommendation, vote or other exercise of discretion as a public servant,' or 'a violation of a known legal duty as public servant.'" *Id.*

The generic definition of bribery in 1961 thus controls what the Travel Act proscribes.   Applying *Chi*'s methodology here, Black's Law Dictionary (4th ed. 1951)— the latest edition in 1961—defines bribery as the "offering, giving, receiving, or soliciting of any thing of value to influence action as official or in discharge of legal or public duty."  The first edition of the Model Penal Code similarly defines a person "guilty of bribery" as one who "offers, confers or agrees to confer upon another" "any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter" or "any benefit as consideration for a violation of a known legal duty as public servant or party official."   Model Penal Code § 240.1, Bribery in Official and Political Matters (Am. Law Inst., 1962); *see also Chi*, 936 F.3d at 897.  Materially the same as

public bribery in 2001, public bribery in 1961 would therefore require the following: (1) two parties—one who "offered," "conferred" or "agreed to confer" the thing, and one who "received," "solicited," or "agreed to accept" it; (2) something to be given by the bribe-giver—either a "thing of value," a "pecuniary benefit," or "any benefit"; and (3) something to be given by the bribe-taker—either "official action," "the recipient's decision, opinion, recommendation, vote or other exercise of discretion as a public servant," or "a violation of a known legal duty as public servant." *Cf. Chi*, 936 F.3d at 897.

This generic understanding of public bribery in 1961 thus requires both a contemplated (1) quid pro quo and (2) an official act involving a public official. First, Black's describes giving "any thing of value" to "influence action," while the Model Penal Code describes conferring "pecuniary benefit as consideration" for a recipient's action. "Quid pro quo"—or "one thing for another"—comfortably encapsulates these descriptions of an exchange. Second, Black's requires that the bribe-giver seek to "influence action as official or in discharge of legal or public duty," while the Model Penal Code describes the bribe recipient's contemplated "exercise of discretion as a public servant" or "violation of a known legal duty as public servant." An "official act" captures this requirement.

## B.

We now compare the generic definition of bribery under the Travel Act to the California bribery statutes that served as predicates to Shen Zhen's Travel Act convictions. The district court instructed the jury on three California bribery statutes. First, California Penal Code § 67.5 proscribes "giv[ing] or offer[ing] as a bribe" "any thing the theft of

which would be petty theft" to any California city employee. Second, California Penal Code § 85 criminalizes "giv[ing] or offer[ing] to give a bribe to . . . any member of the legislative body of a city," "or attempts by menace, deceit, suppression of truth, or any corrupt means, to influence a member in giving or withholding his or her vote, or in not attending the house or any committee of which he or she is a member."  Third, California Penal Code § 165 prohibits "giv[ing] or offer[ing] a bribe to any member of any common council" of any city "with intent to corruptly influence such member in his action on any matter or subject pending before, or which is afterward to be considered by, the body of which he is a member."  In turn, a "bribe" is defined by California law as giving or promising something of value "with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity."  Cal. Penal Code § 7(6).   The district court instructed the jury on these California provisions.

Shen Zhen's primary contention is that "bribery" under the Travel Act requires a quid pro quo *and* a contemplated official act, but California's bribery statutes do not, and therefore California's bribery statutes categorically cannot suffice as predicates.  In *People v. Gaio*, 81 Cal. App. 4th 919 (2000), the California Court of Appeal held that bribery under California law "does not require that a specific official action be pending when the bribe is given, or that there be proof that the bribe was intended to influence any particular such act."  *Id.* at 929 (citing *People v. Diedrich*, 31 Cal. 3d 263 (1982)).   "Rather," the Court of Appeal stated, "it is sufficient that the evidence reflect that there existed subjects of potential action by the recipient, and that the bribe was given or received with the intent that some such action be

influenced." *Id.* Before the district court, the Government acknowledged that bribery under California law does not require a quid pro quo or a specific official act, and the district court's jury instructions reflected the same understanding.

California bribery law does not require that a thing of value be "intended to influence any particular . . . act" (a quid pro quo) or that "a specific official action be pending when the bribe is given" (an official act). *Id.* As construed by the California courts, bribery under California law is therefore broader than the Travel Act's generic definition of bribery.

## C.

We must now determine if this mismatch between the generic definition of bribery under the Travel Act and the California bribery statutes requires vacating Shen Zhen's Travel Act convictions. We conclude that it does not. Even if broader, state law violations can serve as predicates under the Travel Act if the jury convicted the defendant based on elements that conformed to the generic definition of the crime.

The Supreme Court in *Nardello* noted that "Congress' intent [in passing the Travel Act] was to aid local law enforcement officials, not to eradicate only those extortionate activities which any given State denominated extortion." 393 U.S. at 293–94. It then concluded that "the acts for which appellees have been indicted fall within the generic term extortion as used in the Travel Act." *Id.* at 296. The Court in *Taylor* likewise provided in the sentencing context that the "categorical approach . . . may permit the sentencing court to go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required

to find all the elements of generic burglary." 495 U.S. at 602. [6] The Court has reiterated this rule in requiring a sentencing judge to "look only to 'the elements of the [offense], not to the facts of [the] defendant's conduct.'" *Mathis, v. United States*, 579 U.S. 500, 510 (2016) (quoting *Taylor*, 495 U.S. at 601).

The Government charged and the jury convicted Shen Zhen based on required findings of both a specific intent to enter a quid pro quo and to receive an official act—the elements of the generic definition of "bribery" proscribed by the Travel Act. Here, the jury instructions stated that the jury had to find that Shen Zhen "performed *the charged act* . . . in violation of [the California statutes]." For each "charged act," the jury was required to find that Shen Zhen "provided [benefits] in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the L.A. Grand Hotel." The jury's required findings specify the quid pro quo (benefits in exchange for Huizar agreeing to perform) and the official acts (Huizar acting in his official capacity to benefit the redevelopment of the L.A. Grand Hotel). Indeed, jury instruction language matches what Shen Zhen itself proposed to the district court for the Travel Act jury instructions, requiring a showing that Defendant "agreed to pay [benefits] in exchange for . . . Huizar agreeing to take official acts to benefit the L.A. Grand Hotel project." Shen Zhen has no cause to complain.

The jury therefore convicted Shen Zhen based on elements that conform to the generic definition of "bribery"

---

[6] Citing *Perrin* and *Chi*, Shen Zhen asserts that the court must apply a "categorical approach" when analyzing predicate state law offenses under the Travel Act. Neither case applied such an approach or requires us to do so here.

under the Travel Act, not merely California's broader "intent to influence" without a specific official action in mind.  *See Gaio*, 81 Cal. App. 4th at 929, 931.  Although a case *could* exist in which only California law and not the Travel Act proscribes certain conduct, Shen Zhen's convictions do not present that scenario.  Because California law proscribes the generic definition of bribery, for which a jury convicted Defendant under the Travel Act, the California bribery statutes were proper predicate offenses.  We affirm Defendant's Travel Act convictions.

## V.

We review for abuse of discretion a district court's evidentiary rulings.  *United States v. Boulware*, 384 F.3d 794, 800–01 (9th Cir. 2004).  We may affirm an evidentiary ruling on any basis supported by the record, even if it differs from the district court's reasoning.  *United States v. Alexander*, 48 F.3d 1477, 1487 (9th Cir. 1995).  We will reverse "only if such error 'more likely than not affected the verdict.'"  *United States v. Schales*, 546 F.3d 965, 976 (9th Cir. 2008) (quoting *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004)); *see also United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (requiring reversal "unless there is a 'fair assurance' of harmlessness" (citation omitted)).

Shen Zhen argues that it is entitled to a new trial because the district court admitted evidence of "Huizar's pay-to-play dealings with *other* people in *unrelated* real-estate projects" "that Huang knew nothing about."  Shen Zhen contends that this evidence was prejudicial because it "allowed the Government to brand Huang before the jury as just another corrupt developer, buying an illicit product everyone knew Huizar was selling."  In addition, Shen Zhen maintains the

district court wrongly excluded hearsay evidence concerning Huang's innocent state of mind.

We conclude that the district court properly admitted evidence of Huizar's general-pay-to-play scheme but wrongly excluded Huang's alleged statements about his state of mind regarding his gift-giving. Because any error is unlikely to have affected the verdict on this record, however, we do not disturb the convictions on evidentiary grounds.

## A.

Prior to trial, the district court granted Defendant's motion to exclude evidence of "other schemes" between Huizar and other developers but permitted the Government to present evidence of "the general framework of the pay-to-play-scheme" where that framework "equally applied" to Defendant. The district court also allowed the Government to present evidence of Huizar's money laundering, finding "the fact that Huizar felt the need to go to such lengths to conceal the cash tends to demonstrate that Huizar understood that Mr. Huang and Shen Zhen intended to enter into a corrupt relationship."

Federal Rule of Evidence 404(b) supports admitting evidence of Huizar's general pay-to-play scheme. While character evidence is inadmissible, evidence of "[o]ther [c]rimes, [w]rongs, or [a]cts" may be admitted to "prov[e] motive, opportunity, intent, preparation, plan[ning], knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Evidence of other acts must (1) "tend to prove a material issue;" (2) "not be too remote in time;" (3) provide "sufficient evidence for a reasonable jury to conclude that the [party] committed the prior acts;" and (4) "when used to show knowledge and intent, . . . be sufficiently similar to the charged offense."

*United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1264 (9th Cir. 2024).  The district court did not abuse its discretion in admitting this evidence.

Discussion of how Huizar and his staff generally interacted with developers was probative of Huizar's motive, intent, and plan to receive bribes at the time of his relationship with Defendant, and was relevant to Huizar's "sufficiently similar" pay-to-play scheme with developer Huang and Shen Zhen.  *See id.; see also United States v. McCourt*, 925 F.2d 1229, 1234 (9th Cir. 1991) (noting evidence of third-party acts are admissible to show "a modus operandi or a common plan").  Evidence is admissible to establish "the circumstances surrounding the crime with which the defendant has been charged" so that the jury can "make sense of the testimony in its proper context." *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992).  Here, Esparza explained that a developer who provided benefits to Huizar would become a "friend of the office" and receive favorable treatment on a project; Huizar and the developer often used middlemen such as Esparza to communicate; and a goal of the scheme was to maintain Huizar's political power and conceal the bribes.

The scheme's general framework provided context for Esparza's testimony explaining how Huang became a "friend of the office," Esparza and Zheng became the middlemen for advancing Huang's redevelopment project, and Huang supported Huizar's reelection through concealed funds.  Esparza's initial testimony on Huizar's pay-to-play methods provided "sufficient contextual or substantive connection" to Shen Zhen's involvement and was necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the

crime." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012–13 (9th Cir. 1995).

Contrary to Defendant's assertion, the Government did not introduce evidence of specific examples of other developers or their particular gifts to Huizar. Esparza testified as to how Huizar's office operated to solicit bribes from "friends of the office," but the jury did not hear evidence of other named developers, their projects, or their bribes.

Testimony from Huizar's family members about his money-laundering activities also directly concerned Shen Zhen's crimes. Huizar's family members testified as to how he used them to launder illicitly gained funds by asking them to deposit cash with banks and then to write him checks. The court allowed this testimony because it found the Government had provided sufficient foundation that the cash Huizar laundered through his family members, often immediately after his Las Vegas trips, derived from Huang.

The family members' testimony evinced acts in furtherance of the bribery scheme between Huizar and Defendant. "Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud [through mail or wire fraud] admissible against other participants." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992). As the district court correctly found, the evidence of Huizar's money-laundering activities demonstrated that Huizar perceived he was in a corrupt relationship with Huang and that a bribery scheme existed between the two men, even if Huang was unaware of how Huizar was laundering the funds. *See id.* In addition, the evidence showed that Huizar used his mother to launder

some of the cash Huang gave him in Las Vegas and then make payments on the East West Bank loan that he had received on account of Huang's collateral. The district court did not abuse its discretion in admitting probative evidence of Huizar's general pay-to-play bribery scheme and money-laundering activities.

## B.

During the Government's direct examination of Zheng, he testified that he had discussed with colleagues his concerns about Huang giving Huizar casino chips. On cross-examination, Zheng stated that he raised his concerns directly with Huang. When defense counsel asked Zheng about Huang's response, the district court sustained the Government's objection on hearsay grounds. The court erred in doing so.

Zheng's expected testimony falls under the state-of-mind exception to hearsay. Federal Rule of Evidence 803(3) allows for the admission of "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional . . . condition (such as mental feeling . . .)." As the parties acknowledge, defense counsel sought to elicit Huang's out-of-court response to Zheng that Huang thought he and Huizar "were just having fun," "not doing anything wrong," and that he "had not asked . . . Huizar for anything." Had Zheng been able to offer this testimony, it would have been probative not as to the truth of these statements but whether Huang *felt* culpable in his interactions with Huizar. *See Wagner v. Cnty. of Maricopa*, 747 F.3d 1048, 1052–53 (9th Cir. 2013) ("None of this testimony would have been put forth in order to establish the truth of what he had said" but "to show his state of mind at the time of the conversation."). Although Zheng could not testify as to the

*factual basis* for Huang's mindset, *see United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994), at least some of the excluded statements were probative of Huang's "then-existing state of mind" and "mental feeling" about his actions—admissible as an exception to the rule against hearsay. Fed. R. Evid. 803(3).

Nevertheless, we find that the court's exclusion of Zheng's testimony constituted harmless error. The overwhelming evidence that Shen Zhen participated in a bribery scheme with the requisite corrupt intent far outweighs the minimal scope of how Huang responded to Zheng's concerns. The Government presented substantial evidence of Huang's culpable mental state, including that Huang passed Huizar gambling chips in discreet VIP rooms, Huang was aware that Zheng used pseudonyms for Huizar during the Las Vegas trips, and the men agreed to a "cooling-off period" from Las Vegas after Palazzo casino security personnel confronted Huizar. Huang later provided Huizar with the $600,000 settlement payment through an elaborate arrangement involving a shell company, a trusted employee left in the dark about the reason for the transfer, and a disbarred attorney's trust account. Moreover, Zheng was still able to testify as to Huang's mens rea by describing how Huang continued to take Huizar to Las Vegas even after Zheng had voiced his concerns and how Huang persisted in the redevelopment project after learning of the FBI's investigation.

Because it is highly unlikely that the district court's evidentiary error "affected the verdict" in light of the record before the jury, *Schales*, 546 F.3d at 976 (citation omitted), we conclude that the error was harmless and does not warrant reversal of the jury's verdict.

## CONCLUSION

The Government presented sufficient evidence to support Shen Zhen's jury convictions, and the district court did not abuse its discretion in formulating its jury instructions for quid pro quo bribery.  Further, California's bribery statutes served as proper predicate offenses for Shen Zhen's Travel Act convictions.  Because no evidentiary ruling or other error warrants reversal, Defendant's convictions are **AFFIRMED**.